MICHAEL J. HADDAD (SBN 189114)
JULIA SHERWIN (SBN 189268)
MAYA RODRIGUEZ SORENSEN (SBN 250722)
TERESA ALLEN (SBN 264865)
HADDAD & SHERWIN LLP
505 Seventeenth Street
Oakland, CA 94612
Telephone:     (510) 452-5500
Facsimile:     (510) 452-5510

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

RANDALL SCOTT JOHNSON, DECEASED, by
and through his Successor in Interest, KATHERINE
JOHNSON, KATHERINE JOHNSON, Individually,

        Plaintiff,

    vs.

CITY OF REDDING, a public entity; REDDING
POLICE CHIEF ROGER MOORE; REDDING
POLICE OFFICER DARREN HULL; REDDING
POLICE OFFICER TREVOR KUYPER; SHASTA
COUNTY, a public entity; SHASTA COUNTY
SHERIFF-CORONER TOM BOSENKO, in his
individual and official capacities; SHASTA
COUNTY JAIL  CAPTAIN DAVE KENT;
SERGEANT B. RODGERS; DEPUTY
MCQUILLAN; DEPUTY WYATT MASON;
DEPUTY JOSHUA DORSTAD; CALIFORNIA
FORENSIC MEDICAL GROUP,
INCORPORATED, a California corporation; DOE
Defendant 1; KERI RUBALCAVA, R.N.;
AMANDA REAM, R.N.; LINDA SMITH, R.N.;
JOHN MAIKE, Psychiatric R.N.; CYNTHIA
COLLINS, L.V.N.; SHELBY CALLAHAN, L.V.N.;
DEBORAH SAEGER, MFT,  and DOES 2–20;
individually, jointly, and severally,

        Defendants.

Case No.

**COMPLAINT FOR DAMAGES,
DECLARATORY &
INJUNCTIVE RELIEF, AND
DEMAND FOR JURY TRIAL**

Plaintiff, by and through her attorneys, HADDAD & SHERWIN LLP, for her Complaint against Defendants, states as follows:

## JURISDICTION

1.      This is a civil rights wrongful death/survival action arising from Defendants' unreasonable seizure, unlawful arrest, and deliberate indifference to the serious medical and mental health needs of pretrial detainee, RANDALL JOHNSON, resulting in his death on August 16, 2018, at the Shasta County jail.  This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution, and the laws and Constitution of the State of California.  Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343.  Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367, to hear and decide claims arising under state law.

## INTRADISTRICT ASSIGNMENT

2.      A substantial part of the events and/or omissions complained of herein occurred in the City of Redding, Shasta County, California, and, pursuant to Eastern District Civil Local Rule 120(d), this action is properly assigned to the Sacramento Division of the United States District Court for the Eastern District of California.

## PARTIES AND PROCEDURE

3.      Plaintiff KATHERINE JOHNSON is the sister of Decedent RANDALL JOHNSON and a resident of the State of Washington.  Plaintiff KATHERINE JOHNSON brings these claims individually and as successor in interest for Decedent RANDALL JOHNSON pursuant to California Code of Civil Procedure §§ 377.10 et seq.  Decedent RANDALL JOHNSON had no spouse or children, and his parents are deceased, making his sister, Plaintiff KATHERINE JOHNSON, entitled to intestate succession as his next of kin.  A successor in interest declaration is filed herewith.

4.      Plaintiff brings these claims pursuant to California Code of Civil Procedure §§ 377.20 et seq. and 377.60 et seq., which provide for survival and wrongful death actions.  Plaintiff also brings her claims individually and on behalf of Decedent RANDALL JOHNSON on the basis of 42 U.S.C. §§ 1983 and 1988, the United States Constitution, federal and state civil rights law,

and California law.  Plaintiff also brings these claims as a Private Attorney General, to vindicate not only her rights, but others' civil rights of great importance.

5.      Defendant CITY OF REDDING ("CITY") is a public entity, duly organized and existing under the laws of the State of California.  Under its authority, the CITY owns, operates, manages, directs, and controls the Redding Police Department ("RPD"), which employs and/or is responsible for the other City of Redding Defendants in this action.  Pursuant to California Government Code § 815.2, the CITY is vicariously liable for the state law torts of its employees and agents, including the individual Defendants herein.

6.      Defendant Redding Police Chief ROGER MOORE ("MOORE"), at all times mentioned herein, was employed by Defendant CITY OF REDDING as Chief of Police, and he was acting within the course and scope of that employment.  As Chief of Police, Defendant MOORE was a policy making official for Defendant CITY, with the power to make official and final policy for the RPD.  In that capacity, Defendant MOORE was ultimately responsible for all hiring, training, supervision, policies, customs, and procedures of the Redding Police Department, and specifically for the supervision and training of Defendants Redding Police Officers DARREN HULL and TREVOR KUYPER, and for the ratification of their misconduct in this matter. Defendant MOORE is being sued in his individual capacity.

7.      Defendant REDDING POLICE OFFICER DARREN HULL ("HULL"), at all times mentioned herein, was employed by Defendant CITY OF REDDING as a police officer, and was acting within the course and scope of that employment.

8.      Defendant REDDING POLICE OFFICER TREVOR KUYPER ("KUYPER"), at all times mentioned herein, was employed by Defendant CITY OF REDDING as a police officer, and was acting within the course and scope of that employment.

9.      Defendant COUNTY OF SHASTA ("COUNTY") is a public entity, duly organized and existing under the laws of the State of California.  Under its authority, the COUNTY operates the Shasta County Sheriff's Office (SCSO).

10.     Defendant SHERIFF-CORONER TOM BOSENKO ("BOSENKO"), at all times mentioned herein, was employed by Defendant COUNTY as Sheriff-Coroner for the COUNTY, and he was acting within the course and scope of that employment.  In that capacity, Defendant

BOSENKO was a policy making official for the COUNTY OF SHASTA.  Further, Defendant BOSENKO was ultimately responsible for the provision of medical care to inmates at the COUNTY jail, including assessment of inmates for medical emergencies and possible mental health needs, and all COUNTY and CFMG policies, procedures, and training related thereto.  He is being sued in his individual capacity.

11.     Defendant CAPTAIN DAVE KENT ("KENT"), at all times mentioned herein, was employed by Defendant COUNTY as Captain of the Custody Division, including the jail, for the COUNTY, and he was acting within the course and scope of that employment.  In that capacity, Defendant KENT was a policy making official for the COUNTY OF SHASTA.  Further, Defendant KENT was responsible for the general management and control of the Custody Division, with primary authority and responsibility for the operations, staff assignments, program development, personnel supervision and training, maintenance and auxiliary inmate services at the jail, subordinate only to the Sheriff and/or Undersheriff.

12.     Defendant SERGEANT B. RODGERS ("RODGERS"), at all times mentioned herein, was employed by Defendant COUNTY as a sergeant and supervisor at the jail, and was acting within the course and scope of that employment.

13.     Defendant DEPUTY MCQUILLAN ("MCQUILLAN"), at all times mentioned herein, was employed by Defendant COUNTY as a corrections deputy at the jail, and was acting within the course and scope of that employment.

14.     Defendant DEPUTY WYATT MASON ("MASON"), at all times mentioned herein, was employed by Defendant COUNTY as a corrections deputy at the jail, and was acting within the course and scope of that employment.

15.     Defendant DEPUTY JOSHUA DORSTAD ("DORSTAD"), at all times mentioned herein, was employed by Defendant COUNTY as a corrections deputy at the jail, and was acting within the course and scope of that employment.

16.     Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC. ("CFMG"), was at all times herein mentioned, a California corporation licensed to do business in California, with its corporate headquarters located in Monterey, California.  Defendant CFMG provided medical, mental health, and nursing care to pretrial and post-conviction detainees and prisoners in Shasta

County Jails, pursuant to a contract with the COUNTY OF SHASTA.  On information and belief, CFMG and their employee and medical director for CFMG's services at Shasta County Jail,  DOE Defendant 1, are responsible for making and enforcing policies, procedures, supervision, and training related to the medical care of prisoners and detainees in Defendant COUNTY OF SHASTA's jails, including but not limited to assessing inmate-patients for mental health and emergency medical needs, sending patients for emergency medical care and mental health care, providing appropriate alcohol and drug detoxification and withdrawal care, and refusing jail admission for patients before they have received necessary medical clearance and care from a hospital.  On information and belief, CFMG and its employees and agents are and were at all material times responsible for making and executing policies, procedures, supervision, and training related to the medical care and/or mental health care of detainees and prisoners in the COUNTY OF SHASTA jails, including, but not limited to, properly assessing and classifying inmates, properly sending inmates for emergency medical and mental health care, properly sending inmates for medical clearance before admission to the jail, properly assessing and addressing the mental health needs of inmates, alcohol and drug detoxification and withdrawal, properly assessing and treating the serious medical and mental health needs of inmates, including suicide prevention, observation of suicidal and potentially suicidal inmates, mental illness, and emotional disturbance.  Defendants DOE Defendant 1, KERI RUBALCAVA, R.N., AMANDA REAM, R.N., LINDA SMITH, R.N., Psychiatric Nurse JOHN MAIKE, R.N., CYNTHIA COLLINS, L.V.N., SHELBY CALLAHAN, L.V.N., DEBORAH SAEGER, MFT -- as well as certain DOE DEFENDANTS including, but not limited to CFMG employees and agents acting within the course and scope of their employment with CFMG (and within the course and scope of their employment by COUNTY by virtue of CFMG's contract with COUNTY) -- were all responsible for properly sending inmates for emergency medical care and/or medical clearance before admitting them to the jail, assessing and classifying inmates, properly assessing and addressing the medical needs of inmates, properly assessing and addressing the mental health needs of inmates, providing appropriate alcohol and drug detoxification and withdrawal, properly assessing and treating the serious medical needs of inmates, providing appropriate observation and a treatment plan for serious medical needs,

including suicide prevention, care and treatment for mental illness and emotional disturbance, monitoring inmates, and summoning emergency medical care when it was needed.

17.     DOE Defendant 1 was at all times herein mentioned a physician licensed to practice medicine in the State of California, a managing agent and employee of Defendant CFMG, working as the medical director of Defendant COUNTY's jails responsible for overseeing and providing medical care to prisoners and detainees, and he was acting within the course and scope of that employment.  On information and belief, DOE Defendant 1 was ultimately responsible for CFMG's provision of medical care to inmates at the jails, including sending inmate-patients for emergency medical care, refusing to admit patients due to a medical emergency, refusing to admit patients until they received medical clearance from a hospital, assessing patients for possible mental health and emergency medical needs, including assessing patients for possible suicide risk, instituting appropriate suicide precautions; instituting and supervising appropriate alcohol and drug detoxification and withdrawal, approving housing classification; instituting appropriate treatment plans for the serious medical and mental health needs of patients; communicating about a patient's medical and mental health needs with custodial staff, health care professionals, and outside facilities; and all CFMG policies, procedures, and training related thereto.

18.     In addition, DOE Defendant 1 was at all times responsible for staffing the CFMG medical and psychiatric services at SHASTA COUNTY jail, including but not limited to providing appropriate staff-to-patient ratios, making sure that only properly licensed and credentialed health care providers provide care, and that no provider work outside his or her scope of practice or licensure.  DOE Defendant 1 acted with deliberate indifference to the serious medical needs of RANDALL JOHNSON and other patients.

19.     Defendant KERI RUBALCAVA, R.N. was at all material times CFMG's Program Manager for SHASTA COUNTY, and acted within the course and scope of her duties.  She was responsible for all aspects of the medical and mental health care provided by CFMG employees at Shasta County jail, including, staffing, training, and supervision of all nursing staff.  She did so with deliberate indifference to the serious medical needs of RANDALL JOHNSON and other patients. In addition, Defendant RUBALCAVA allowed and assigned Licensed Vocational Nurses to work outside their legal scope of practice.

20.     Defendant AMANDA REAM, R.N. was at all material times employed by Defendant CFMG, and acted within the course and scope of that employment. Defendant REAM performed the intake medical and mental health assessment on Decedent RANDALL JOHNSON when he was booked into jail, and failed to follow appropriate protocols for assessing, monitoring, and treating Decedent, including failing to send him for emergency medical treatment, failing to obtain a medical clearance before admitting him to the jail, failing to provide appropriate alcohol and drug detoxification and withdrawal care, failing to summon medical care for Decedent, and failing to inform any physician or mid-level provider about Mr. JOHNSON's condition and serious medical needs, despite his obvious medical and/or mental health emergency requiring immediate transfer to a hospital for inpatient emergency and psychiatric treatment, with deliberate indifference to Mr. JOHNSON's serious medical needs.

21.     Defendant LINDA SMITH, R.N., was at all material times employed by Defendant CFMG, and acted within the course and scope of that employment. As set forth below, Defendant SMITH failed to properly assess and treat RANDALL JOHNSON, failed to summon emergency medical care for him, and failed to inform any physician or mid-level provider about his emergent and life-threatening medical condition, all with deliberate indifference to Mr. JOHNSON's serious medical needs.

22.     Defendant JOHN MAIKE, R.N., was at all material times employed by Defendant CFMG, and acted within the course and scope of that employment. As set forth below, Defendant MIAKE failed to properly assess and treat RANDALL JOHNSON, failed to summon emergency medical care for him, and failed to inform any physician or mid-level provider about his emergent and life-threatening medical condition, all with deliberate indifference to Mr. JOHNSON's serious medical needs.

23.     Defendant CYNTHIA COLLINS, L.V.N., was at all material times employed by Defendant CFMG, and acted within the course and scope of that employment. As set forth below, Defendant COLLINS worked outside her legal scope of practice as a Licensed Vocational Nurse ("L.V.N."), failed to properly request a properly licensed, nursing or medical assessment for RANDALL JOHNSON, failed to summon emergency medical care for him, and failed to inform

any physician, mid-level provider, or registered nurse about his emergent and life-threatening medical condition, all with deliberate indifference to Mr. JOHNSON's serious medical needs.

24.     Defendant SHELBY CALLAHAN, L.V.N., was at all material times employed by Defendant CFMG, and acted within the course and scope of that employment.  As set forth below, Defendant CALLAHAN worked outside her legal scope of practice as a Licensed Vocational Nurse ("L.V.N."), failed to properly request a properly licensed, nursing assessment for RANDALL JOHNSON, failed to summon emergency medical care for him, and failed to inform any physician, mid-level provider, or registered nurse about his emergent and life-threatening medical condition, all with deliberate indifference to Mr. JOHNSON's serious medical needs.

25.     Defendant DEBORAH SAEGER, MFT, was at all material times employed by Defendant CFMG, and acted within the course and scope of that employment.  As set forth below, Defendant SAEGER was notified of MR. JOHNSON's grave condition multiple times by CFMG Defendants REAM, SMITH, COLLINS, and CALLAHAN yet failed to go to the jail to assess him, failed to summon emergency medical care, and failed to inform any physician or mid-level provider of his need for emergency medical care, in deliberate indifference to MR. JOHNSON's serious medical and mental health needs.

26.     Plaintiff is ignorant of the true names and capacities of Defendants DOES 1-20 (DOE Defendants") and therefore sues these Defendants by such fictitious names.  Plaintiff is informed and believes and thereon alleges that each Defendant so named is responsible in some manner for the injuries and damages sustained by Plaintiff as set forth herein.  Plaintiff will amend her complaint to state the names and capacities of each DOE DEFENDANT when they have been ascertained.

27.     Plaintiff is informed and believes and thereon alleges that each of the Defendants was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things herein alleged, was acting within the course and scope of that relationship.  Plaintiff is further informed and believes and thereon alleges that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter specifically alleged.  At all material times, each Defendant was

jointly engaged in tortious activity and an integral participant in the conduct described herein, resulting in the deprivation of Plaintiff's and Decedent's constitutional rights and other harm.

28.     The acts and omissions of Defendant REDDING POLICE OFFICERS DARREN HULL, TREYVOR KUYPER, and CHIEF MOORE were at all material times pursuant to the actual customs, policies, practices and procedures of the CITY OF REDDING and the Redding Police Department.  The acts and omissions of COUNTY AND CFMG DEFENDANTS as set forth herein, were at all material times pursuant to the actual customs, policies, practices and procedures of the COUNTY, the Shasta County Sheriff's Office and/or CFMG.

29.     At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of the State of California and either Shasta County or the City of Redding.

30.     Plaintiff timely and properly filed tort claims with Shasta County and the City of Redding pursuant to California Government Code sections 910 et seq., and this action is timely filed within all applicable statutes of limitation.

31.     This complaint may be pled in the alternative pursuant to Federal Rule of Civil Procedure 8(d).

### GENERAL ALLEGATIONS

32.     Plaintiff realleges each and every paragraph in this complaint as if fully set forth here.

33.     RANDALL JOHNSON was a 56-year-old man who suffered from depression and had a significant history of severe alcoholism, including bouts of delirium tremens and blackouts, and past suicidal conduct and ideations.

34.     On or about August 14, 2018, at approximately 7:53 p.m., MR. JOHNSON's friend, Kevin Hafenstein, called 911 seeking medical assistance for MR. JOHNSON after observing MR. JOHNSON sitting outside of his home in his driveway at 1287 Deodar Way, Redding California, wearing only underwear and shoes, hallucinating, making incoherent statements, and talking to himself and to people who were not present.  Mr. Hafenstein explained to the 911 dispatcher that MR. JOHNSON was a severe alcoholic with no known history of drug use, and that he had begun

taking methamphetamine a few days before in an attempt to commit suicide.  Mr. Hafenstein further explained that the methamphetamine was still affecting MR. JOHNSON and that Mr. Hafenstein thought he might be overdosing.  Mr. Hafenstein also informed the 911 dispatcher that Mr. Johnson had no weapons in his possession.

35.     At approximately 8:00 p.m., Mr. Hafenstein called 911 again and explained that MR. JOHNSON had now vomited, soiled himself multiple times, and continued to ramble unintelligibly. Mr. Hafenstein further told the 911 dispatcher he thought MR. JOHNSON was overdosing, and needed an ambulance quickly, and Mr. Hafenstein said MR. JOHNSON was screaming and Mr. Hafenstein had never seen him act that way before.  When asked by the 911 dispatcher if MR. JOHNSON was becoming aggressive, Mr. Hafenstein responded, "He's still sitting down, he's not moving because he has soiled himself numerous times and keeps talking about it."

36.     The following SHASCOM dispatch detail went out to the Redding Police Department ("RPD"): "REQ [REQUEST] 5150 EVAL [EVALUATION] ON FRIEND.  FRIEND IS CURRENTLY SITTING IFO RESD [IN FRONT OF RESIDENCE] TALKING TO PEOPLE WHO ARENT [SIC] THERE. FRIEND HAS HX [HISTORY] OF ALCOHOLISM AND POSS [POSSIBLY] INJECTED HIMSELF W/METH [WITH METHAMPHETAMINE] SEVERAL DAYS AGO.  MALE IS NOT KNOWN TO USE H & S [HEALTH & SAFETY CODE CONTROLLED SUBSTANCES].  FRIEND IS UNAWARE RP [REPORTING PARTY] IS CALLING."

37.     The Shasta County 911 dispatcher also called American Medical Response ambulance service, informing them of the need to respond for a California Welfare & Institutions Code § 5150 evaluation for MR. JOHNSON at his home, and a paramedic and emergency medical technician responded to the scene.

38.     At approximately 8:34 p.m., Defendants Redding Police Officers DARREN HULL and TREVOR KUYPER responded to MR. JOHNSON'S home at 1287 Deodar Way in Redding for a Welfare & Institutions Code § 5150 evaluation.  At that time, Defendant Redding Police Chief ROGER MOORE and the Redding Police Department did not equip officers with video or audio

recorders.  Defendant HULL reported that, upon arrival, he observed MR. JOHNSON wearing only underwear and shoes, curled into the fetal position on his left side, with feces seeping out of his underwear and feces smeared on his back and arms.  Rather than provide medical assistance, ask Mr. Hafenstein what had transpired, or even inquire into MR. JOHNSON'S well-being, Defendants HULL and KUYPER immediately approached MR. JOHNSON and unnecessarily placed his arms in painful twist lock control holds.  Defendant HULL then handcuffed MR. JOHNSON as he laid in his own urine and feces.  Defendant HULL noted that MR. JOHNSON's heart beat was 130 beats per minute, which indicated that he was suffering from tachycardia, given that a healthy adult heart normally beats 60–100 times per minute, and that he "spoke rapidly and randomly, was overall fidgety, had rapid eyelid fluttered, and constricted pupils."  Defendant HULL also reported that MR. JOHNSON stated that "he had used $100 of methamphetamine, partially by injecting it into his system, partially by ingesting it anally," and that he had "used the methamphetamine constantly during the past three days."  MR. JOHNSON specifically informed Defendant HULL that "he used a large amount of methamphetamine to kill himself."  Given this information, Defendant HULL and KUYPER should have immediately sought emergency medical care for MR. JOHNSON, but failed to do so in deliberate indifference to his serious medical and psychiatric needs.

    39.    At approximately 8:44 p.m., the American Medical Response (AMR) paramedic and EMT arrived on scene, but Defendants HULL and KUYPER turned them away, advising -- with no basis at all -- that no medical assistance was needed, with deliberate indifference to MR. JOHNSON's obvious and serious medical needs.  The AMR life support personnel left the scene with no contact with MR. JOHNSON, due to Defendants HULL and KUYPER's deliberate choice to prevent these desperately needed emergency medical treaters from reaching MR. JOHNSON. Defendants HULL and KUYPER knew or must have known that MR. JOHNSON was suffering from obvious and apparent signs of being in an emergency medical and psychiatric crisis and in need of immediate hospitalization, yet they prevented AMR from assessing MR. JOHNSON'S serious medical needs.  Defendant HULL later falsely reported that AMR assisted with cleaning

MR. JOHNSON up before Defendants transported him to Shasta County Jail, when in fact, AMR never provided any care to MR. JOHNSON at all.

40.     Despite MR. JOHNSON indisputably fitting the Welfare and Institutions Code §5150 criteria for being a danger to himself or others, or gravely disabled, and despite his obvious medical emergency and need to go to the hospital immediately, rather than transporting him to a hospital for emergency medical and psychiatric care, Defendants HULL and KUYPER unlawfully arrested MR. JOHNSON for public intoxication pursuant to California Penal Code § 647(f), and Defendant HULL transported him to Shasta County jail, in deliberate indifference to his serious medical and psychiatric needs.  During the entire incident, MR. JOHNSON remained in his driveway, on his private property, never having entered the public, and the arrest for public intoxication was clearly unlawful and unconstitutional.

41.     Upon arrival at the Shasta County jail, MR. JOHNSON was placed in the sally port area to await booking.  As noted below, Defendant Deputy WYATT MASON ("MASON") cleared MR. JOHNSON for admission to the jail.  Defendant Deputy MCQUILLAN was briefed about the fact that MR. JOHNSON had injected as much methamphetamine as he could and inserted the remaining amount into his rectum in an attempt to commit suicide.  With deliberate indifference to MR. JOHNSON'S serious medical needs, Defendant MCQUILLAN did not summon emergency medical care for MR. JOHNSON, instead allowing him to be held in the COUNTY jail.

42.     The sally port and booking area were equipped with audio and video recording devices that captured the intake process.  Defendant HULL escorted MR. JOHNSON into the sally port area and placed him on a bench.  MR. JOHNSON was screaming in agony, hallucinating, talking to people who were not there, talking to himself, making outbursts of incoherent statements, and singing.  He continued to make self-harming statements, such as "Just pull your gun out and shoot me. You'll get it done quick."  He informed the jail staff that, "I tried to commit suicide," and "I took $100 worth of meth."  As he sat handcuffed on the bench, MR. JOHNSON vomited and continued to soil himself.

43.     At about 9:21 p.m., CFMG Defendant AMANDA REAM, R.N. ("REAM") performed the jail's intake medical and mental health assessment on MR. JOHNSON.   Defendant REAM evaluated MR. JOHNSON and noted that his pulse was tachycardic, significantly elevated at 128 bpm.  Defendant REAM noted that MR. JOHNSON informed her he had a history of hypertension and heart disease, placing him at increased risk of death or serious physical injury from methamphetamine.  MR. JOHNSON also suffered from extensive bruising, which Defendant REAM failed to document.  Defendant REAM further noted that MR. JOHNSON was under the influence of methamphetamine and that he stated, "I tried to commit suicide with $100 worth of meth."  Even though Defendant REAM knew MR. JOHNSON had not only injected methamphetamine but also took it rectally, she stated "No" in response to the intake assessment form's question whether the patient had ingested or placed any drugs into a body cavity.  Defendant REAM marked on the intake form that MR. JOHNSON exhibited feelings of guilt/worthlessness/shame, depression, that he was acting incoherently or strange by making outbursts of unusual statements, that he appeared dirty and disheveled, he had rapid speech, was engaging in inappropriate activity, making statements of loss of job and girlfriend, and expressing feelings of hopelessness and lack of compassion in the world.  Despite noting these serious medical and mental health conditions, rather than send MR. JOHNSON to a hospital immediately, Defendant REAM simply notified CFMG Defendant DEBORAH SAEGER, MFT ("SAEGER"), who was miles away, of MR. JOHNSON'S condition and determined that MR. JOHNSON was medically fit to enter the jail without any emergency medical or psychiatric treatment or even any medical clearance from a hospital.  Defendant REAM chose not to refuse jail admission for MR. JOHNSON and send him to a hospital Emergency Department for evaluation, not to make an emergent/urgent medical provider referral, and not even to schedule MR. JOHNSON for any medical provider sick call.  Defendant SAEGER who, on information and belief, lived over 90 miles away from the jail, was informed of MR. JOHNSON's condition and failed to come into the jail to assess MR. JOHNSON, failed to summon emergency medical care, and failed to notify any physician or mid-level provider of his need for emergency medical care, in deliberate indifference

1    to MR. JOHNSON's serious medical and mental health needs.  At no time before his death did MR.

2    JOHNSON ever see any physician, physician's assistant, or nurse practitioner.  Upon information

3    and belief, no Defendant informed any physician, physician's assistant, or nurse practitioner of MR.

4    JOHNSON's medical or mental health condition at any time before he died.

5         44.    COUNTY Defendant Sergeant B. RODGERS ("RODGERS") was, on information

6    and belief, the jail supervisor at the time of MR. JOHNSON's booking and admission, and

7    responsible for all supervision, as well as the admission and care of inmates at the jail.  COUNTY

8    Defendant Deputy MASON was assigned as the Booking Processor at Shasta County jail at the time

9    MR. JOHNSON was booked, and cleared MR. JOHNSON for admission to the jail without

10   necessary emergency medical care or clearance, with deliberate indifference to MR. JOHNSON's

11   serious medical needs.

12        45.    On information and belief, Defendant RODGERS also authorized MR. JOHNSON's

13   entry into the jail.  Defendant MASON then booked MR. JOHNSON into the jail as a pretrial

14   detainee and, together, Defendants RODGERS and REAM determined that MR. JOHNSON should

15   be placed in a Safety Cell.  Defendants REAM, RODGERS, and MASON had actual knowledge

16   that MR. JOHNSON was in extreme medical and psychiatric distress and in need of emergency

17   medical/psychiatric care, and they decided not to provide or request such necessary treatment for

18   MR. JOHNSON in a hospital, in deliberate indifference to his serious medical needs.

19        46.    At the time of the booking, on information and belief, Defendant HULL did not

20   inform jail staff that MR. JOHNSON had a history of alcoholism, as Defendant HULL had been

21   informed by the 911 dispatcher.   However, MR. JOHNSON had previously been arrested and held

22   at the SHASTA COUNTY jail due to his alcoholism and intoxication.  At no time was MR.

23   JOHNSON provided appropriate alcohol and drug detoxification and withdrawal care or

24   monitoring.

25        47.    Given MR. JOHNSON's condition, Defendants MASON, RODGERS, and REAM

26   should have gone on a computer in the booking area and looked up information from MR.

27

28

1  JOHNSON's previous incarcerations. Had they looked, they would have learned that MR.

2  JOHNSON had past incarcerations related to his alcoholism.

3      48.     As MR. JOHNSON sat on the bench in the sally port area awaiting entry into the jail,

4  he defecated and vomited on himself again while suffering from the effects of his attempted suicide

5  by methamphetamine intoxication. Video footage shows Defendants HULL, MASON, and Deputy

6  A. Amaya laughing at MR. JOHNSON, cracking jokes, and gagging in disgust at MR. JOHNSON's

7  condition as MR. JOHNSON watched them helplessly, handcuffed, and unable to provide for his

8  own medical needs. Defendants HULL, MASON, and/or Deputy A. Amaya made cruel and

9  insensitive comments to MR. JOHNSON, such as, "Dude you smell so fucking bad, it's ridiculous,"

10  and, "You smell like butthole, bro." Defendant HULL also laughed about his decision to arrest

11  MR. JOHNSON rather than transport him to a hospital. During all this time, Defendant REAM was

12  present and never once advocated for her patient, MR. JOHNSON, nor summoned the emergency

13  medical care he needed.   Instead, she allowed these Defendants to taunt him and make fun of his

14  medical emergency.

15      49.     At approximately 9:30 p.m., Defendants HULL, MASON, and Deputy Amaya

16  escorted MR. JOHNSON to the Safety Cell. On information and belief in view of Defendants

17  HULL and MASON, Deputies H. Cortez and M. Espinoza and other deputies arrived to assist with

18  the placement. Deputy Cortez grabbed MR. JOHNSON'S left arm while Defendant MASON

19  grabbed MR. JOHNSON'S right arm and both Deputies Cortez and MASON forcibly pinned MR.

20  JOHNSON's wrists behind his back using painful rear wrist lock pain compliance holds. Deputy

21  Espinoza then forcibly used a leg sweep maneuver to take MR. JOHNSON down to the ground. On

22  information and belief, there was no need to use any force on MR. JOHNSON at all, as he had been

23  following the deputies' orders throughout the booking, intake, and the safety cell placement

24  process. On information, Defendants HULL and MASON were present and observed this excessive

25  force by other deputies and failed to intervene to stop it or to protect MR. JOHNSON, exhibiting

26  further callousness and indifference to MR. JOHNSON's well-being and medical needs. MR.

27

28

1    JOHNSON was then placed in a Safety Cell, his clothing was removed and he was given a Safety

2    smock and a blanket.

3        50.    At approximately midnight on August 15, 2018, CFMG Defendant LINDA SMITH,

4    R.N. ("SMITH") checked MR. JOHNSON'S vital signs in the Sobering Cell.  On information and

5    belief, jail and/or medical staff cleared Mr. JOHNSON from the Safety Cell he was initially placed

6    in and moved him to a Sobering Cell at some point between intake and midnight despite MR.

7    JOHNSON being in an obvious medical and psychiatric crisis.  Defendant SMITH noted that MR.

8    JOHNSON'S vital signs continued to be elevated: 132/112 blood pressure, pulse was 103 bpm and

9    his respiration rate was 18.  Knowing that MR. JOHNSON's vital signs had been elevated for hours

10   at this point and he had taken large amounts of methamphetamine in an attempt to commit suicide,

11   Defendant SMITH failed to summon emergency medical care or contact the on-call medical

12   provider (physician or physician's assistant), with deliberate indifference to MR. JOHNSON's

13   serious medical needs.  Defendant SMITH also notified Defendant SAEGER of MR. JOHNSON's

14   medical and mental health condition at this time and again Defendant SAEGER failed to come into

15   the jail to assess MR. JOHNSON, failed to summon emergency medical care, and failed to notify

16   any physician or mid-level provider of his need for emergency medical care, all in deliberate

17   indifference to MR. JOHNSON's serious medical and mental health needs.

18       51.    When Defendant SMITH returned to check on MR. JOHNSON at approximately

19   4:00 a.m., she reported, "[Inmate] angry [refused] to sit up for vs; leave me alone!"  She also noted

20   that at that time Mr. JOHNSON had started passing a bowel movement and began touching his

21   genitalia.  Instead of summoning additional assistance from the jail deputies or other medical staff

22   so that she could perform the important vital signs check on MR. JOHNSON, whose vital signs had

23   been elevated when she earlier had checked them, Defendant SMITH simply noted that he should

24   be checked again at 8:00 a.m.  Again, with deliberate indifference to MR. JOHNSON's serious

25   medical needs, Defendant SMITH chose not to send MR. JOHNSON for emergency medical care

26   or notify the on-call medical provider about his condition. Defendant SMITH notified Defendant

27   SAEGER of MR. JOHNSON's condition again, yet Defendant SAEGER failed to come into the jail

28

1    to assess MR. JOHNSON, failed to summon emergency medical care, and failed to notify any

2    physician or mid-level provider of his need for emergency medical care, all in deliberate

3    indifference to MR. JOHNSON's serious medical and mental health needs.

4          52.    At approximately 9:00 a.m., CFMG Defendant CYNTHIA COLLINS, L.V.N.

5    ("COLLINS") cleared MR. JOHNSON from the Sobering Cell and did a Safety Cell assessment on

6    him, outside her legal scope of practice.  Defendant COLLINS noted that MR. JOHNSON was

7    cleared from the Sobering Cell and that his vital signs remained significantly abnormal: his blood

8    pressure was 138/88, his heart rate had slowed to 56 bpm, which indicated that he was suffering

9    from bradycardia, and his respiration rate was 18.  Defendant COLLINS also noted that MR.

10   JOHNSON had a hard time following directions, and that Mental Health had seen MR. JOHNSON

11   at his cell, and that his next "meth check" would be the next day, on August 16, 2018 at 4:00 a.m.

12   On information and belief, MR. JOHNSON's vital signs were never checked again after this August

13   15, 2018, 9:00 a.m. check by Defendant COLLINS.  Defendant COLLINS also notified Defendant

14   SAEGER of MR. JOHNSON's medical and mental health condition and again Defendant SAEGER

15   failed to come into the jail to assess MR. JOHNSON, failed to summon emergency medical care,

16   and failed to notify any physician or mid-level provider of MR. JOHNSON'S need for emergency

17   medical care, despite having been notified of MR. JOHNSON's serious medical and mental health

18   condition on at least four occasions at this point, all in deliberate indifference to his serious medical

19   and mental health needs.

20         53.    As a Licensed Vocational Nurse, Defendant COLLINS's scope of practice limited

21   her to collecting data, recording observations, and reporting those observations to a Registered

22   Nurse or a physician to do a physical assessment of the patient.  LVN's are not permitted to work

23   independently; they must work under the direct supervision of a Registered Nurse or physician at all

24   times.  Defendant COLLINS, despite knowing the limits on the LVN scope of practice, improperly

25   assessed MR. JOHNSON'S condition, worked without the legally required supervision, and failed

26   to request an RN, mid-level provider, or physician to assess MR. JOHNSON'S condition, all in

27

28

direct violation of the legal scope of practice for LVNs and with deliberate indifference to MR. JOHNSON'S serious medical needs.

54.     On February 14, 2017, Ann Shuman, R.N., on behalf of the California Board of Vocational Nursing and Psychiatric Technicians (BVNPT), informed Defendants that triage is outside the legal scope of practice for Licensed Vocational Nurses.  Defendant CFMG has a long history of having LVN's work alone in county jails, unsupervised, and outside their legal scope of practice, conducting patient assessments.

55.     Ms. Shuman testified on February 26, 2018, in a wrongful death case in the Northern District of California against Defendant CFMG: *Neuroth v. Mendocino County, et al., No. 3:15-CV-03226-RS.*  With CFMG's attorneys present, Ms. Shuman confirmed the legal limits on the LVN scope of practice and testified that the decisions whether to refer the patient for emergency medical care or emergency or crisis mental health evaluation, assign a patient to a Safety Cell or Sobering Cell, assess whether a patient is at risk of suicide, assign the patient to the next mental health clinic or for routine mental health evaluation, are triage decisions outside the LVN scope of practice.  In addition to clear law and regulations limiting the LVN scope of practice, Defendant CFMG was put on notice by the BVNPT long before MR. JOHNSON's death that their LVNs were working outside of their scope of practice, yet CFMG and its employees and managing agents, including DOE 1 continued the practice throughout the jails they serve, including Shasta County jail.

56.     Defendants CFMG, DOE Defendant 1, and RUBALCAVA persistently assigned LVN's to work unsupervised and alone, outside their legal scope of practice.

57.     CFMG holds itself and its officers, directors, and managing agents out as experts in the field of correctional healthcare.  Yet, CFMG has been criticized for its inadequate health care provided to inmates throughout the State of California.  A January 17, 2015, article in the *Sacramento Bee* entitled, "California for-Profit Company Faces Allegations of Inadequate Inmate Care," reported that CFMG's population-adjusted rate of suicide or drug overdose deaths in custody is 50% higher than non-CFMG counties.  In a 10-year period ending in May 2014, 92 people died of suicide or a drug overdose while in the custody of a jail served by CFMG. (https://www.sacbee.com/news/investigations/the-public-eye/article7249637.html)

58.     Plaintiff is informed and believes and thereon alleges that CFMG must pay for emergency and inpatient hospital treatment for SHASTA COUNTY jail inmates, creating a disincentive for CFMG to refer patients such as MR. JOHNSON off-site for necessary, emergency inpatient hospitalization or psychiatric treatment.

59.     Plaintiff is further informed and believes and thereon alleges that Defendants CFMG, DOE Defendant 1, and RUBALCAVA allow uncredentialed Licensed Vocational Nurses (LVN's) to perform the work of Registered Nurses (RN's) and higher level care providers, in order to save money, since CFMG pays LVN's significantly less than it pays RN's.

60.     On August 15, 2018, at approximately 10:11 a.m., mental health nurse, CFMG Defendant JOHN MAIKE, R.N. ("MAIKE"), conducted a mental health sick call on MR. JOHNSON in the Safety Cell.  Defendant MAIKE noted that MR. JOHNSON was sitting on the floor in the Safety Cell talking to himself, picking at the floor, had rambled speech, and was disorganized.  Rather than having MR. JOHNSON transported to a hospital for a § 5150 evaluation or emergency medical care, Defendant MAIKE kept MR. JOHNSON on suicide watch and simply encouraged him to stay hydrated, in deliberate indifference to his serious medical and mental health needs.

61.     Over the next several hours, at approximately 3:30 p.m. in the Safety Cell and at 9:30 p.m. in the Sobering Cell, CFMG Defendant SHELBY CALLAHAN, L.V.N. ("CALLAHAN") checked on MR. JOHNSON and reported that he refused to allow her to check his vital signs during both checks.  Defendant CALLAHAN knew or must have known that MR. JOHNSON's vital signs had been significantly elevated since at least the previous day and he had been suffering from both tachycardia and bradycardia, had vomited and defecated on himself the previous day, and continued exhibiting signs of distress and grave medical and mental health emergency.  Defendant CALLAHAN failed to contact an R.N. or the on-call provider upon observing MR. JOHNSON's condition or to inform them of the failure to take MR. JOHNSON's vital signs, and further failed to summon emergency care for him.  Defendant CALLAHAN notified Defendant SAEGER of MR. JOHNSON's condition during both Safety Cell and Sobering Cell checks and again Defendant SAEGER failed to come into the jail to assess MR. JOHNSON, failed

to summon emergency medical care, and failed to notify any physician or mid-level provider of his need for emergency medical care, in deliberate indifference to MR. JOHNSON's serious medical and mental health needs.

62.     On August 16, 2018, at approximately 4:00 a.m., CFMG Defendant LINDA SMITH, RN, conducted a Safety Cell check on MR. JOHNSON and noted that he refused to have his vital signs checked again.  At this point, MR. JOHNSON's vital signs had not been checked since 9:00 a.m. the previous day.  Defendant SMITH also knew that MR. JOHNSON had refused his vital sign checks on August 15, 2018.  At approximately 5:50 a.m. on August 16, 2018, Defendant SMITH, signed off on the notations created by Defendant COLLINS on August 15 at 9:38 a.m., and Defendant CALLAHAN on August 15 at 10:48 p.m., noting that MR. JOHNSON had refused to have his vital signs taken.  Yet, she did nothing to obtain the life-saving emergency medical treatment and assessment MR. JOHNSON needed.  Defendant SMITH notified Defendant SAEGER again of MR. JOHNSON's grave condition, yet Defendant SAEGER failed to come into the jail to assess MR. JOHNSON, failed to summon emergency medical care, and failed to notify any physician or mid-level provider of his need for emergency medical care, in deliberate indifference to his serious medical and mental health needs.

63.     Defendant SAEGER was notified of MR. JOHNSON's deteriorating medical and mental health condition on seven separate occasions over a two day period and never once came to the jail to assess MR. JOHNSON, never summoned emergency medical care, and never informed any physician or mid-level provider of his need for emergency medical care.  CFMG Defendants REAM, SMITH, COLLINS, and CALLAHAN simply continued to report that they notified Defendant SAEGER of MR. JOHNSON's condition while knowing that Defendant SAEGER had not made any effort to ensure MR. JOHNSON obtained the emergency medical care he desperately needed, even though Defendants REAM, SMITH, COLLINS, and CALLAHAN observed MR. JOHNSON's medical and mental health continue to decline hour after hour, all in deliberate indifference to his serious medical and mental health needs.

64.     Throughout the nearly two days MR. JOHNSON spent incarcerated at Shasta County jail, multiple jail deputies conducted intermittent Safety Cell and Sobering Cell checks on him and noted that they observed MR. JOHNSON sitting, standing or laying down talking to himself.

65.     MR. JOHNSON's last documented Safety Cell check was claimed to have occurred at 6:45 a.m. on August 16, 2018, by County Deputy Christopher Murrill.  On information and belief, the COUNTY's Safety Cell policy requires direct visual observations of inmates in safety cells twice every thirty minutes.

66.     After MR. JOHNSON'S death, County Defendant Deputy JOSHUA DORSTAD ("DORSTAD") reported that he conducted a welfare check on MR. JOHNSON in the Safety Cell at approximately 7:20 a.m. on August 16, 2018.  Defendant DORSTAD claimed that MR. JOHNSON was standing at the door when he checked on him, and when Defendant DORSTAD said "Good morning," MR. JOHNSON "mumbled a few unintelligible word to me and contained to look out of his cell."  Defendant DORSTAD's alleged welfare check was not documented in the Safety Cell logs, as required, on information and belief, by COUNTY policy.  Additionally, as noted below, MR. JOHNSON was already deceased by 7:20 a.m. on August 16, 2018.

67.     At approximately 7:35 a.m., Defendant MCQUILLAN and another COUNTY Deputy attempted to get MR. JOHNSON to go to the mental health clinic.  When the deputies opened the cell door and Defendant MCQUILLAN told MR. JOHNSON to get up to go see Mental Health, Mr. JOHNSON did not reply.  Defendant MCQUILLAN reports he tried to move MR. JOHNSON, and MR. JOHNSON was cold to the touch and pulseless.  COUNTY deputies told Defendant COLLINS to come and assess MR. JOHNSON.  As an LVN, doing the assessment was outside the legal scope of practice for Defendant COLLINS.  Upon touching MR. JOHNSON, Defendant COLLINS also noted MR. JOHNSON was cold to touch, she believed he had a slight and sporadic carotid pulse, and his skin color was gray.

68.     Additionally, by the time the Defendant Sheriff-Coroner's investigator, Leo Spear, arrived and assessed MR. JOHNSON at 8:20 a.m., on August 16, 2018, livor mortis was present and blanching, and Mr. Spear also noted multiple contusions on MR. JOHNSON's legs, forearms,

and buttocks.  The medical evidence discussed above confirms that MR. JOHNSON had been deceased long before Defendant MCQUILLAN found him unresponsive, and he was certainly deceased when Defendant DORSTAD claimed in his late supplemental report written after MR. JOHNSON's death that he had done a safety cell check on MR. JOHNSON at 7:20 a.m.

69.     Watch Commander Chase Reed summoned an ambulance after the deputies' attempts to revive MR. JOHNSON were unsuccessful.  The paramedics arrived, but also could not revive Mr. JOHNSON.  Time of death was called at 8:01 a.m. on August 16, 2018.

70.     All COUNTY and CFMG employed Defendants had actual knowledge that MR. JOHNSON was suffering from serious emergency medical/psychiatric needs, and all Defendants were deliberately indifferent to those serious medical/psychiatric needs, and denied MR. JOHNSON necessary medical and/or psychiatric care, including necessary emergency care.  Defendants were deliberately indifferent to MR. JOHNSON's safety and medical/psychiatric needs in their jail admission, placement, assessment, and custody, and care decisions.  On information and belief, due to such deliberate indifference, MR. JOHNSON's medical/psychiatric condition deteriorated.

71.     Additionally, even though MR. JOHNSON was an alcoholic, at no time did any Defendant put him on appropriate detoxification protocols, causing him to endure untreated alcohol withdrawal.

72.     Once Defendants knew that MR. JOHNSON had ingested methamphetamine, the effects of which were causing excessively elevated vital signs, they should have sent him to a hospital Emergency Department immediately, instead they left him in the jail for nearly two days, suffering, and in serious need of appropriate emergency medical treatment.

73.     Defendants HULL, KUYPER, ROGERS, MASON, MCQUILLAN, DORSTAD, REAM, SMITH, MAIKE, COLLINS, CALLAHAN, SAEGER, and the remaining DOE DEFENDANTS knew and/or must have known that MR. JOHNSON had serious medical and psychiatric needs requiring emergency treatment, care, and hospitalization, and that with deliberate indifference to such needs, these Defendants, and/or remaining DOES caused MR. JOHNSON to be deprived of such necessary, life-saving medical and psychiatric care.

74.     According to the official Shasta County autopsy report, MR. JOHNSON's cause of death was: toxic effects of methamphetamine, with hypertensive cardiovascular disease as a significant condition.  The manner of death was considered a suicide.

75.     The autopsy report also included a list of injuries present on MR. JOHNSON's body during the autopsy:

- A 1 x 1 purple contusion is at the lower inner mucosal lip just right of anterior midline.
- A pair of punctate red petechiae straddles the maxillary frenulum.
- A large somewhat rectilinear and obliquely oriented 12 x 7 purple-brown contusion is on the right buttock.
- Approximately 5 x 2.5 cm indistinct mauve contusion with overlying linear and parallel pink-orange abrasion up to 1 cm is on the posterior left hand near the base of the thumb.
- Indistinct purple-pink contusion with irregular pink-orange abrasion measuring 3 x 1 cm covers the ventral medial right wrist.
- The dorsolateral right wrist is covered by mauve contusion overlaid by four linear and horizontally red-pink abrasions up to 3.5 cm long and each separated by 0.3 cm.
- A 3 x 3 cm mauve contusion is on the proximal lateral left thigh.
- A 1.5 x 1 cm orange-brown abrasion is on the lateral left knee.
- Indistinct pink-purple contusion covers the lateral left knee.
- A 2 x 2 cm orange-brown abrasion is on the lateral left knee.
- A 3 x 2 cm pink-brown abrasion is on the anteromedial left knee.
- A 1 x 0.2 cm orange-brown abrasion, horizontally oriented, is on the proximal anterior left lower leg.
- A 3 x 0.8 cm orange-brown abrasion is on the proximal anterior left lower leg.

- Indistinct pink-purple contusion with few overlying punctate to up to 1 x 1 cm brown-red abrasion cover the lateral right knee and proximal anterolateral right lower leg.
- An indistinct 3 x 2 cm mauve contusion is on the lateral right malleolus.
- A 2 x 2 cm red-brown abrasion/contusion is on the proximal anteromedial right lower leg.
- A 1.2 x 0.4 cm pink-orange abrasion is on the proximal anterior right lower leg.
- Indistinct mauve contusion spans the mid-portion of the anteromedial right lower leg.
- A 4 x 2 cm mauve contusion with 1 x 0.5 cm pink-orange abrasion is on the distal anteromedial right lower leg.
- Ovoid pink-orange abrasions up to 1 cm in greatest dimension are scattered across the dorsal right foot.
- A 7.5 x 6 cm mauve contusion is on the anteromedial right thigh.

76.     MR. JOHNSON's death was the proximate result of the CITY Defendants' decision to falsely arrest MR. JOHNSON while he was in a medical/psychiatric crisis on his own property, rather than allow the AMR paramedic and EMT to evaluate and treat MR. JOHNSON and transport him to the hospital for emergency medical care for his serious medical/psychiatric needs.

77.     Decedent's death was also the proximate result of the individual COUNTY Defendants' (RODGERS, MASON, MCQUILLAN, DORSTAD, and DOES) and CFMG Defendants' (REAM, SMITH, MAIKE, COLLINS, CALLAHAN, SAEGER and DOES) deliberate indifference to his serious medical needs, as set forth above.

78.     MR. JOHNSON's death was also the proximate result of Defendant COUNTY's failure to reasonably train and supervise jail deputies tasked with screening, admitting, observing, monitoring, and protecting MR. JOHNSON.  These substantial failures reflect Defendant COUNTY's policies implicitly or directly ratifying and/or authorizing the deliberate indifference to serious medical needs and the failure to reasonably train, instruct, monitor, supervise, investigate,

1   and discipline deputy sheriffs employed by Defendants COUNTY and SHERIFF-CORONER TOM

2   BOSENKO ("BOSENKO") in the use of unnecessary force and deliberate indifference to inmates'

3   serious medical needs.

4         79.    Decedent's death was also the proximate result of Defendants CFMG and CFMG's

5   Medical Director, DOE Defendant 1, and Program Manager, KERI RUBALCAVA, R.N.'s failure

6   to reasonably staff, train, supervise, and equip their medical and mental healthcare staff in the

7   proper and reasonable screening, assessment, and care of emotionally disturbed inmates or inmates

8   needing emergency medical treatment; failure to implement and enforce generally accepted, lawful

9   policies and procedures at the jail; deliberate choices to permit and require LVN's to work outside

10  of their legal scope of practice; and deliberate indifference to the serious medical/psychiatric needs

11  of inmates such as RANDALL JOHNSON.  These substantial failures reflect Defendant CFMG's

12  policies implicitly ratifying and/or authorizing the deliberate indifference to serious medical needs

13  by their medical and mental healthcare staff and the failure to reasonably train, instruct, monitor,

14  supervise, investigate, and discipline medical and mental healthcare staff employed by Defendants.

15        80.    At all material times, and alternatively, the actions and omissions of each Defendant

16  were intentional, wanton, and/or willful, conscience-shocking, reckless, malicious, deliberately

17  indifferent to Decedent's and Plaintiff's rights, done with actual malice, grossly negligent,

18  negligent, and objectively unreasonable.

19        81.    As a direct and proximate result of each Defendant's acts and/or omissions as set

20  forth above, to the extent permitted and pled by the various legal claims set forth below, Plaintiff

21  sustained the following injuries and damages, past and future, among others:

22             a.    Wrongful death of RANDALL JOHNSON, pursuant to Cal. Code of Civ.

23                  Proc. § 377.60 et. seq.;

24             b.    Loss of support and familial relationships, including loss of love,
                companionship, comfort, affection, society, services, solace, and moral

25                  support, pursuant to Cal. Code of Civ. Proc. § 377.60 et. seq.;

26             c.    RANDALL JOHNSON's hospital and medical expenses, pursuant to Cal.

27                  Code of Civ. Proc. § 377.20 et. seq.;

28

1

        d.      RANDALL JOHNSON's coroner's fees, funeral and burial expenses, pursuant to Cal. Code of Civ. Proc. § 377.20 et. seq.;

2

3

        e.      Violation of RANDALL JOHNSON's constitutional rights, pursuant to Cal. Code of Civ. Proc. § 377.20 et. seq. and federal civil rights law;

4

        f.      RANDALL JOHNSON's loss of life, pursuant to federal civil rights law;

5

6

        g.      RANDALL JOHNSON's conscious pain, suffering, and disfigurement, pursuant to federal civil rights law;

7

8

        h.      All damages and penalties recoverable under 42 U.S.C. §§ 1983 and 1988, and as otherwise allowed under California and United States statutes, codes, and common law.

9

10

11

12

**FIRST CAUSE OF ACTION**
**(42 U.S.C. § 1983)**
**AGAINST DEFENDANTS HULL, KUYPER, RODGERS, MASON, MCQUILLAN, DORSTAD, REAM, SMITH, MAIKE, COLLINS, CALLAHAN, SAEGER**
**AND REMAINING DOES**

13

14

      82.    Plaintiff realleges each and every paragraph in this complaint as if fully set forth here.

15

16

17

18

19

20

      83.    By the actions and omissions described above, Defendants HULL, KUYPER, RODGERS, MASON, MCQUILLAN, DORSTAD, REAM, SMITH, MAIKE, COLLINS, CALLAHAN,  SAEGER, AND REMAINING DOES violated 42 U.S.C. § 1983, depriving Decedent RANDALL JOHNSON, through Plaintiff herein, of the following clearly established and well-settled constitutional rights protected by the Fourth and Fourteenth Amendments to the United States Constitution:

21

22

23

        a.  Decedent's right to be free from deliberate indifference to RANDALL JOHNSON's serious medical needs while in custody as a pretrial detainee as secured by the Fourth and/or Fourteenth Amendments.

24

25

26

27

      84.    Additionally, by the actions and omissions leading up to RANDALL JOHNSON's admission into the jail described above, Defendants HULL and KUYPER violated 42 U.S.C. § 1983, depriving Decedent RANDALL JOHNSON, through Plaintiff herein, of the following clearly established and well-settled constitutional rights protected by the Fourth and Fourteenth Amendments to the United States Constitution:

28

a. Decedent's right to be free from unreasonable seizure and unlawful arrest without probable cause, as secured by the Fourth Amendment;

b. Decedent's right to be free from objectively unreasonable conduct and deliberate indifference to RANDALL JOHNSON's serious medical needs while in custody as a detainee and/or arrestee as secured by the Fourth and/or Fourteenth Amendments.

85. Defendants subjected Decedent to their wrongful conduct, depriving Decedent of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Decedent and others would be violated by their acts and/or omissions.

86. As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Decedent, through Plaintiff herein, sustained injuries and damages as set forth above at ¶ 81.

87. The conduct of Defendants entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and as provided by law.  Plaintiff does not seek punitive damages against Defendants COUNTY or CITY.

88. Plaintiff is also entitled to reasonable costs and attorneys' fees under 42 U.S.C. § 1988, and other applicable United States and California codes and laws.

**SECOND CAUSE OF ACTION**
**(*Monell* - 42 U.S.C. § 1983)**
**AGAINST DEFENDANTS COUNTY, CITY, AND CFMG**

89. Plaintiff realleges each and every paragraph in this complaint as if fully set forth here.

90. The unconstitutional actions and/or omissions of Defendants RODGERS, MASON, MCQUILLAN, DORSTAD, REAM, SMITH, MAIKE, COLLINS, CALLAHAN,  SAEGER, and REMAINING DOES, as well as other employees or officers employed by or acting on behalf of the Defendants COUNTY and/or CFMG, on information and belief, were pursuant to the following customs, policies, practices, and/or procedures of Defendants COUNTY and/or CFMG, stated in the

alternative, which were directed, encouraged, allowed, and/or ratified by policymaking officers for Defendant COUNTY and its Sheriff's Office and/or Defendant CFMG:

    a.    To deny pretrial detainees and other inmates access to timely, appropriate, competent, and necessary care for serious medical and psychiatric needs, requiring such inmates in crisis to remain untreated in jail instead of providing for their emergency medical needs;

    b.    To allow and encourage inadequate and incompetent medical and mental health care for jail inmates and arrestees;

    c.    To contract for obviously inadequate medical and psychiatric care for jail inmates and arrestees, including creating financial incentives for jail and CFMG staff not to send inmates with emergency medical needs to a hospital;

    d.    To allow, encourage, and require Licensed Vocational Nurses to work outside their legal scope of practice and without appropriate supervision;

    e.    To allow, encourage, and require unlicensed, incompetent, inadequately trained and/or inadequately supervised staff to assess inmates' medical and psychiatric condition, needs, and treatment, including to decide whether or not to provide inmates with necessary emergency care and hospitalization;

    f.    To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning handling mentally ill and/or emotionally disturbed persons or persons in medical crisis;

    g.    To cover up violations of constitutional rights by any or all of the following:

        i.    By failing to properly investigate and/or evaluate incidents of violations of rights, including by unconstitutional medical and psychiatric care at the jail;

        ii.    By ignoring and/or failing to properly and adequately investigate and/or investigate and discipline unconstitutional or unlawful conduct by jail staff and CFMG employees; and

        iii.    By allowing, tolerating, and/or encouraging jail and CFMG staff to: fail to file complete and accurate reports; file false reports; make false statements; and/or obstruct or interfere with investigations of unconstitutional or unlawful conduct by withholding and/or concealing material information;

    h.    To allow, tolerate, and/or encourage a "code of silence" among law enforcement officers, sheriff's office personnel, and CFMG staff at the jail whereby an officer or member of the sheriff's office, or CFMG staff does not

provide adverse information against a fellow officer, or member of the SCSO, or CFMG staff;

i.   To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in this Complaint and in subparagraphs (a) through (h) above, with deliberate indifference to the rights and safety of Decedent, of Plaintiff and the public, and in the face of an obvious need for such policies, procedures, and training programs.

91.    The unconstitutional actions and/or omissions of Defendants HULL and KUYPER as well as other officers employed by or acting on behalf of the Defendant CITY, on information and belief, were pursuant to the following customs, policies, practices, and/or procedures of Defendant CITY, stated in the alternative, which were directed, encouraged, allowed, and/or ratified by policymaking officers for Defendant CITY and its and its police department, including Defendant CHIEF MOORE:

a.   To fail to properly and adequately hire, train, supervise, and monitor patrol officers;

b.   To fail to use appropriate and generally accepted law enforcement procedures for handling mentally ill and/or emotionally disturbed persons or persons in medical crisis;

c.   To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning handling mentally ill and/or emotionally disturbed persons or persons in medical crisis;

d.   To cover up violations of constitutional rights by any or all of the following:

i.    By failing to properly investigate and/or evaluate complaints or incidents of unlawful seizures of and/or handling of mentally ill and/or emotionally disturbed persons or persons in medical crisis;

ii.   By ignoring and/or failing to properly and adequately investigate and/or discipline unconstitutional or unlawful law enforcement activity; and

iii.  By allowing, tolerating, and/or encouraging law enforcement officers to: fail to file complete and accurate reports; file false reports; make false statements; intimidate, bias and/or "coach" witnesses to give false information and/or to attempt to bolster officers' stories; and/or obstruct or interfere with investigations of unconstitutional or

1    unlawful law enforcement conduct by withholding and/or concealing
     material information;

2    e.    To allow, tolerate, and/or encourage a "code of silence" among law
3          enforcement officers whereby an officer does not provide adverse
           information against a fellow law enforcement officer;

4

5    f.    To fail to have and enforce necessary, appropriate, and lawful policies,
           procedures, and training programs to prevent or correct the unconstitutional
6          conduct, customs, and procedures described in this Complaint and in
           subparagraphs (a) through (e) above, with deliberate indifference to the rights
7          and safety of Decedent, of Plaintiff and the public, and in the face of an
           obvious need for such policies, procedures, and training programs.
8

9         92.    Defendants CITY, COUNTY, and CFMG, through their employees and agents, and

10   through their policy-making supervisors, MOORE,  BOSENKO, KENT, DOE Defendant 1,

11   RUBALCAVA, and remaining DOES, failed to properly hire, train, instruct, monitor, supervise,

12   evaluate, investigate, and discipline Defendants HULL, KUYPER, RODGERS, MASON,

13   MCQUILLAN, DORSTAD, REAM, SMITH, MAIKE, COLLINS, CALLAHAN, SAEGER, AND

14   REMAINING DOES, and other CITY, COUNTY, and CFMG personnel, with deliberate

15   indifference to Plaintiff's, Decedent's, and others' constitutional rights, which were thereby violated

16   as described above.
17

18        93.    The unconstitutional actions and/or omissions of Defendants RODGERS, MASON,

19   MCQUILLAN, DORSTAD, REAM, SMITH, MAIKE, COLLINS, CALLAHAN, SAEGER, AND

20   REMAINING DOES, and other Sheriff's Office personnel, as described above, were approved,

21   tolerated, and/or ratified by policymaking officers for the COUNTY and its Sheriff's Office,

22   including Defendants BOSENKO and KENT, and by CFMG and CFMG medical director DOE

23   Defendant 1.  Plaintiff is informed and believes and thereon alleges that the details of this incident

24   have been revealed to the authorized policymakers within the COUNTY, the Shasta County

25   Sheriff's Office, and CFMG, and that such policymakers have direct knowledge of the fact that the

26

27   death of RANDALL JOHNSON was the result of deliberate indifference to his serious medical

28

COMPLAINT AND JURY DEMAND              29

needs.  Notwithstanding this knowledge, the authorized policymakers within the COUNTY, its

Sheriff's Office, and CFMG have approved of the conduct and decisions of Defendants RODGERS,

MASON, MCQUILLAN, DORSTAD, REAM, SMITH, MAIKE, COLLINS, CALLAHAN,

SAEGER, AND REMAINING DOES in this matter, and have made a deliberate choice to endorse

such conduct and decisions, and the basis for them, that resulted in the death of RANDALL

JOHNSON.  By so doing, the authorized policymakers within the COUNTY and its Sheriff's

Office, and CFMG have shown affirmative agreement with the individual Defendants' actions and

have ratified the unconstitutional acts of the individual Defendants.  Furthermore, Plaintiff is

informed and believes, and thereupon alleges, that DEFENDANTS BOSENKO, KENT, DOE

Defendant 1, RUBALCAVA, and other policy-making officers for the COUNTY and CFMG were

and are aware of a pattern of misconduct and injury caused by COUNTY law enforcement officers

and CFMG employees similar to the conduct of Defendants described herein, but failed to discipline

culpable law enforcement officers and employees and failed to institute new procedures and policy

within the COUNTY and CFMG.

   94. The unconstitutional actions and/or omissions of Defendants HULL and KUYPER,

as described above, were approved, tolerated, and/or ratified by policymaking officers for the CITY

and its police department, including Defendant CHIEF MOORE.  Plaintiff is informed and believes

and thereon alleges that the details of this incident have been revealed to the authorized

policymakers within the Redding Police Department, and that such policymakers including CHIEF

MOORE have direct knowledge of the fact that the arrest and death of RANDALL JOHNSON were

not justified, but represented objective unreasonableness and deliberate indifference to serious

medical needs.  Further, Defendant MOORE must have known that Defendants HULL and

KUYPER violated both generally accepted law enforcement standards and Reddings' Police

Department policies by conspiring to avoid transporting, and refusing to transport, MR. JOHNSON

to an appropriate medical facility rather than the jail, and by prohibiting the AMR Emergency Personnel from assessing, treating, and transporting MR. JOHNSON to the hospital. Notwithstanding this knowledge, CHIEF MOORE and other authorized policymakers within the CITY have approved of the conduct and decisions of Defendants HULL and KUYPER in this matter, and have made a deliberate choice to endorse such conduct and decisions, and the basis for them, that resulted in the death of MR. JOHNSON.  By so doing, CHIEF MOORE and other authorized policymakers within the CITY have shown affirmative agreement with the individual Defendants' actions and have ratified the unconstitutional acts of the individual Defendants.

95.     The aforementioned customs, policies, practices, and procedures; the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; and the unconstitutional orders, approvals, ratification, and toleration of wrongful conduct of Defendants CITY, COUNTY, and CFMG were a moving force and/or a proximate cause of the deprivations of Decedent's clearly established and well-settled constitutional rights in violation of 42 U.S.C. § 1983, as more fully set forth above at ¶¶ 83-84.

96.     Defendants subjected Decedent to their wrongful conduct, depriving Decedent of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Decedent, Plaintiff and others would be violated by their acts and/or omissions.

97.     As a direct and proximate result of the unconstitutional actions, omissions, customs, policies, practices, and procedures of Defendants CITY, COUNTY, and CFMG, as described above, Decedent and Plaintiff suffered serious injuries and death, Plaintiff is entitled to damages, penalties, costs, and attorneys' fees against Defendants CITY, COUNTY, and CFMG as set forth above in ¶¶ 85-88, including punitive damages against Defendant CFMG.

**THIRD CAUSE OF ACTION**
**(Supervisory Liability - 42 U.S.C. § 1983)**
**AGAINST DEFENDANTS MOORE, BOSENKO, KENT, DOE Defendant 1, RUBALCAVA,**
**AND REMAINING DOES**

98.     Plaintiff realleges each and every paragraph in this complaint as if fully set forth here.

99.     At all material times, Defendants MOORE, BOSENKO, KENT, DOE Defendant 1, RUBALCAVA, and REMAINING DOES, had the duty and responsibility to constitutionally hire, train, instruct, monitor, supervise, evaluate, investigate, staff, and discipline the other Defendants employed by their respective agencies in this matter, as well as all employees and agents of the Redding Police Department, Shasta County Sheriff's Office, and CFMG.

100.     Defendants MOORE, BOSENKO, KENT, DOE Defendant 1, RUBALCAVA, and REMAINING DOES failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline the respective employees of their agencies, including Defendants HULL, KUYPER, RODGERS, MASON, MCQUILLAN, DORSTAD, REAM, SMITH, MAIKE, COLLINS, CALLAHAN, SAEGER, AND REMAINING DOES, and other CITY, COUNTY, Sheriff's Office, and CFMG personnel, with deliberate indifference to Plaintiff's, Decedent's, and others' constitutional rights, which were thereby violated as described above.

101.     As supervisors, Defendants MOORE, BOSENKO, KENT, DOE Defendant 1, RUBALCAVA, and REMAINING DOES, each permitted and failed to prevent the unconstitutional acts of other Defendants and individuals under their supervision and control, and failed to properly supervise such individuals, with deliberate indifference to the rights and serious medical needs of MR. JOHNSON.  Each of these supervising Defendants either directed his or her subordinates in conduct that violated Decedent's rights, OR set in motion a series of acts and omissions by his or her subordinates that the supervisor knew or reasonably should have known would deprive Decedent of rights, OR knew his or her subordinates were engaging in acts likely to deprive

Decedent of rights and failed to act to prevent his or her subordinate from engaging in such conduct, OR disregarded the consequence of a known or obvious training deficiency that he or she must have known would cause subordinates to violate Decedent's rights, and in fact did cause the violation of Decedent's rights.  (See, Ninth Circuit Model Civil Jury Instruction 9.4).  Furthermore, each of these supervising Defendants is liable in their failures to intervene in their subordinates' apparent violations of Decedents' rights.

102.   The unconstitutional customs, policies, practices, and/or procedures of Defendants CITY, COUNTY, and CFMG, stated herein, were directed, encouraged, allowed, and/or ratified by policymaking officers for Defendant CITY and its police department, Defendant COUNTY and its Sheriff's Office, and Defendant CFMG, including Defendants MOORE, BOSENKO, KENT, DOE Defendant 1, RUBALCAVA, and REMAINING DOES, respectively, with deliberate indifference to Plaintiff's, Decedent's, and others' constitutional rights, which were thereby violated as described above.

103.   The unconstitutional actions and/or omissions of Defendants HULL, KUYPER, RODGERS, MASON, MCQUILLAN, DORSTAD, REAM, SMITH, MAIKE, COLLINS, CALLAHAN, SAEGER, AND REMAINING DOES, and other Police, Sheriff's Office, and CFMG personnel, as described above, were approved, tolerated, and/or ratified by policymaking officers for the CITY and its police department including Defendant MOORE, COUNTY and its Sheriff's Office including Defendants BOSENKO and KENT, and by CFMG and DOE Defendant 1.  Plaintiff is informed and believes and thereon alleges that the details of this incident have been revealed to Defendants MOORE, BOSENKO, KENT, and DOE Defendant 1 and that such Defendant-policymakers have direct knowledge of the fact that the death of RANDALL JOHNSON was not justified or necessary, but represented deliberate indifference to his serious medical needs, as set forth in paragraphs 83-84 and 93-94 above.   Notwithstanding this knowledge, on information

and belief, Defendants MOORE, BOSENKO, KENT, and DOE Defendant 1 have approved and ratified of the conduct and decisions of HULL, KUYPER, RODGERS, MASON, MCQUILLAN, DORSTAD, REAM, SMITH, MAIKE, COLLINS, CALLAHAN, SAEGER, AND REMAINING DOES in this matter, and have made a deliberate choice to endorse such conduct and decisions, and the basis for them, that resulted in the death of RANDALL JOHNSON.  By so doing, Defendants MOORE, BOSENKO, KENT, and DOE Defendant 1 have shown affirmative agreement with the individual Defendants' actions and have ratified the unconstitutional acts of the individual Defendants.  Furthermore, Plaintiff is informed and believes, and thereupon alleges, that Defendants MOORE, BOSENKO, KENT, and DOE Defendant 1 and other policy-making officers for the CITY, COUNTY, and CFMG were and are aware of a pattern of misconduct and injury, and a code of silence, caused by CITY and COUNTY law enforcement officers and CFMG employees similar to the conduct of Defendants described herein, but failed to discipline culpable law enforcement officers and employees and failed to institute new procedures and policy within the CITY, COUNTY, and CFMG.

104.    In addition, through Defendants DOE Defendant 1 and RUBALCAVA, on behalf of Defendant CFMG, assigned and required LVN's to work alone and unsupervised and outside their legal scope of practice as described herein, even after the BVNPT confirmed that LVN's cannot do the triage, assessment, and screening Defendants assign them to do, and even though Defendants know the LVN scope of practice is limited to data collection and recording and reporting information to a registered nurse, mid-level practitioner, or physicians.  These Defendants have persisted in these violations of the law, to save money for CFMG and increase their profits, with deliberate indifference to the rights and safety of RANDALL JOHNSON and other patients.

105.    The aforementioned customs, policies, practices, and procedures; the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and

discipline; and the unconstitutional orders, approvals, ratification, and toleration of wrongful conduct of Defendants MOORE, BOSENKO, KENT, DOE Defendant 1, RUBALCAVA, and REMAINING DOES were a moving force and/or a proximate cause of the deprivations of Decedent's clearly established and well-settled constitutional rights in violation of 42 U.S.C. § 1983, as more fully set forth above at ¶¶ 83-84.

106.    Defendants subjected Decedent to their wrongful conduct, depriving Decedent of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Decedent, Plaintiff and others would be violated by their acts and/or omissions.

107.    As a direct and proximate result of the unconstitutional actions, omissions, customs, policies, practices, and procedures of Defendants MOORE, BOSENKO, KENT, DOE Defendant 1, RUBALCAVA, and REMAINING DOES as described above, Plaintiff sustained serious and permanent injuries and is entitled to damages, penalties, costs, and attorneys' fees as set forth above in ¶¶ 85-88.

**FOURTH CAUSE OF ACTION**
**(Violation of Civil Code § 52.1) – Survival Claim**
**AGAINST DEFENDANTS HULL, KUYPER, RODGERS, MASON, MCQUILLAN,**
**DORSTAD, REAM, SMITH, MAIKE, COLLINS, CALLAHAN, SAEGER, MOORE,**
**BOSENKO, KENT, DOE Defendant 1, RUBALCAVA, CITY, COUNTY, CFMG**
**and REMAINING DOES**

108.    Plaintiff realleges each and every paragraph in this complaint as if fully set forth here.

109.    Plaintiff brings the claims in this cause of action as survival claims permissible under California law, including Cal. Code of Civ. Proc. Section 377.20 et. seq.

110.    By their acts, omissions, customs, and policies, DEFENDANTS HULL, KUYPER, RODGERS, MASON, MCQUILLAN, DORSTAD, REAM, SMITH, MAIKE, COLLINS, CALLAHAN,  SAEGER,  MOORE, BOSENKO, KENT, DOE Defendant 1, RUBALCAVA,

CITY, COUNTY, CFMG and REMAINING DOES, each Defendant acting in concert/conspiracy, as described above, while RANDALL JOHNSON was in custody, and by threat, intimidation, and/or coercion, interfered with, attempted to interfere with, and violated RANDALL JOHNSON's rights under California Civil Code § 52.1 and under the United States Constitution and California Constitution as follows:

    a.   The right to be free from an unreasonable and unlawful arrest as secured by the Fourth Amendment to the United States Constitution and by the California Constitution, Article 1, §13 [by Defendants HULL and KUYPER only];

    b.   The right to be free from objectively unreasonable treatment and deliberate indifference to RANDALL JOHNSON's serious medical needs while in custody as a pretrial detainee as secured by the Fourth and/or Fourteenth Amendments to the United States Constitution and by California Constitution, Article 1, §§ 7 and 13;

    c.   The right to enjoy and defend life and liberty; acquire, possess, and protect property; and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, § 1;

    d.   The right to protection from bodily restraint, harm, or personal insult, as secured by California Civil Code § 43; and

    e.   The right to emergency medical care as required by California Government Code §845.6.

111.   Defendants' violations of Plaintiff's and Decedent's due process rights with deliberate indifference, in and of themselves constitute violations of the Bane Act.[1]  Alternatively, separate from, and above and beyond, Defendants' attempted interference, interference with, and violation of RANDALL JOHNSON's rights as described above, Defendants violated Decedent's rights by the following conduct constituting threat, intimidation, or coercion:

---

[1] See *Atayde v. Napa State Hosp.*, No. 1:16-cv-00398-DAD-SAB, 2016 U.S. Dist. LEXIS 126639, at *23 (E.D. Cal. Sept. 16, 2016) (citing *M.H. v. Cty. of Alameda*, 90 F. Supp. 3d 889, 899 (N.D. Cal. 2013); see also, *Cornell v. City and County of San Francisco*, Nos. A141016, A142147, 2017 Cal. App. LEXIS 1011 at *58, f.n. 32 (Cal. Ct. App. Nov. 16, 2017) (approving *M.H., supra.*); *Reese v. County of Sacramento*, 888 F.3d 1030, 1043-44 (9th Cir. 2018) (following *Cornell*); *Rodriguez v. County of L.A.*, 891 F.3d 776, 799, 802 (9th Cir. 2018) (following *Cornell*).

a. With deliberate indifference to RANDALL JOHNSON's serious medical needs, suffering, and risk of grave harm including death, depriving RANDALL JOHNSON of necessary, life-saving care for his medical and/or psychiatric needs, including sending away emergency medical services and taking him to jail, where he serious medical needs were ignored;

b. Subjecting RANDALL JOHNSON to ongoing violations of his rights to prompt care for his serious medical and psychiatric needs over days, causing immense and needless suffering, intimidation, coercion, and threats to his life and well-being;

c. Defendants HULL and KUYPER subjecting RANDALL JOHNSON to an unreasonable seizure and unlawful arrest for the purpose of depriving him of his right to treatment for his serious medical and psychiatric needs;

d. Defendants HULL and KUYPER arresting RANDALL JOHNSON because of his medical/psychiatric condition and need for emergency medical care;

e. Violating multiple rights of RANDALL JOHNSON, taunting him and laughing about his medical emergency, requiring him to remain in jail covered in urine, vomit, and feces, and using unnecessary and excessive holds and force as described herein, such that the multiple violations were threatening, intimidating, or coercive;

f. Requiring psychiatric patients in crisis to go to, or remain in, jail instead of allowing them to receive necessary emergency medical and psychiatric care;

g. Deliberately contracting for and causing the provision of inadequate and incompetent medical and mental health care to Shasta County jail detainees and inmates;

h. Requiring LVN's to work outside their scope of practice, and conduct assessments, triage, and make medical and housing decisions for patients, including RANDALL JOHNSON, they are not competent to make;

i. Instituting and maintaining the unconstitutional customs, policies, and practices described herein, when it was obvious that in doing so, individuals such as RANDALL JOHNSON would be subjected to violence, threat, intimidation, coercion, and ongoing violations of rights as Decedent was here.

112. The threat, intimidation, and coercion described herein were not necessary or inherent to Defendants' violation of Decedent's rights, or to any legitimate and lawful jail or law enforcement activity.

113.    Further, all of Defendants' violations of duties and rights, and coercive conduct, described herein were volitional acts; none was accidental or merely negligent.

114.    Further, each Defendant violated Plaintiff's and Decedent's rights with the specific intent and purpose to deprive them of their enjoyment of those rights and of the interests protected by those rights.

115.    Defendants CITY, COUNTY, and CFMG are vicariously liable for the violation of rights by their employees and agents.

116.    As a direct and proximate result of Defendants' violation of California Civil Code § 52.1 and of Decedent's rights under the United States and California Constitutions, Plaintiff (as successor in interest for Decedent) sustained injuries and damages, and against each and every Defendant is entitled to relief as set forth above at ¶¶ 85-88, including punitive damages against all individual Defendants and CFMG, and all damages allowed by California Civil Code §§ 52 and 52.1 and California law, not limited to costs attorneys' fees, and civil penalties.

**FIFTH CAUSE OF ACTION**
**(Negligence)**
**AGAINST DEFENDANTS HULL, KUYPER, RODGERS, MASON, MCQUILLAN,**
**DORSTAD, AND REMAINING DOES, CITY, AND COUNTY**

117.    Plaintiff realleges each and every paragraph in this complaint as if fully set forth here.

118.    At all times, Defendants HULL, KUYPER, RODGERS, MASON, MCQUILLAN, DORSTAD, and REMAINING DOES owed Plaintiff and Decedent the duty to act with due care in the execution and enforcement of any right, law, or legal obligation.

119.    At all times, these Defendants owed Plaintiff and Decedent the duty to act with reasonable care.

120.    These general duties of reasonable care and due care owed to Plaintiff and Decedent by these Defendants include but are not limited to the following specific obligations:

   a.    To summon, or transport RANDALL JOHNSON to, necessary and appropriate emergency medical care for RANDALL JOHNSON;

   b.    To refrain from subjecting RANDALL JOHNSON to an unreasonable seizure and arrest;

   c.    To refrain from unreasonably creating danger or increasing RANDALL JOHNSON's risk of harm, using unnecessary force against him, leaving him covered in feces, urine, and vomit, and taunting him and joking about his life-threatening medical emergency;

   d.    To use generally accepted law enforcement procedures and tactics, including restraint procedures, that are reasonable and appropriate for RANDALL JOHNSON's s status as a mentally ill and/or emotionally disturbed person in medical crisis with serious medical needs;

   e.    To refrain from abusing their authority granted them by law;

   f.    To refrain from violating Plaintiff's rights as guaranteed by the United States and California Constitutions, as set forth above, and as otherwise protected by law.

121.    Defendants HULL, KUYPER, RODGERS, MASON, MCQUILLAN, DORSTAD, and REMAINING DOES, through their acts and omissions, breached each and every one of the aforementioned duties owed to Plaintiff and Decedent.

122.    Defendants CITY and COUNTY are vicariously liable for the violations of state law and conduct of their officers, deputies, employees, and agents, including individual named defendants, under California Government Code section 815.2.

123.    As a direct and proximate result of these Defendants' negligence, Plaintiff and Decedent sustained injuries and damages, and against each and every Defendant named in this cause of action in their individual capacities are entitled to relief as set forth above at ¶¶ 85-88, including punitive damages against such individual Defendants.

### SIXTH CAUSE OF ACTION
### (Violation of California Government Code § 845.6)
### AGAINST DEFENDANTS HULL, KUYPER, RODGERS, MASON, MCQUILLAN, DORSTAD, AND REMAINING DOES

124.   Plaintiff realleges each and every paragraph in this complaint as if fully set forth here.

125.   Defendants HULL, KUYPER, RODGERS, MASON, MCQUILLAN, DORSTAD, and REMAINING DOES knew or had reason to know that RANDALL JOHNSON was in need of immediate medical care and treatment, including being transferred for emergency inpatient hospitalization, and each failed to take reasonable action to summon immediate medical care and treatment.  Defendants HULL and KUYPER even sent Emergency Medical Personnel away and prohibited them from seeing MR. JOHNSON.  Each such individual defendant, employed by and acting within the course and scope of his/her employment with Defendants CITY and COUNTY, knowing and/or having reason to know of RANDALL JOHNSON's need for immediate medical care and treatment, failed to take reasonable action to summon such care and treatment in violation of California Government Code § 845.6.

126.   Defendants CITY and COUNTY are vicariously liable for the violations of state law and conduct of their officers, deputies, employees, and agents, including individual named defendants, under California Government Code sections 815.2 and 845.6.

127.   As a direct and proximate result of the aforementioned acts of these Defendants, Plaintiff and Decedent were injured as set forth above, and their losses entitle Plaintiff to all damages allowable under California law.  Plaintiff (individually and as Successor in Interest for Decedent) sustained serious and permanent injuries and is entitled to damages, penalties, costs, and attorney fees under California law as set forth in ¶¶ 85-88, above, including punitive damages against these individual Defendants.

**SEVENTH CAUSE OF ACTION**
**(False Arrest and Imprisonment)**
**AGAINST DEFENDANTS HULL, KUYPER, and CITY OF REDDING**

128.     Plaintiff realleges each and every paragraph in this complaint as if fully set forth here.

129.     At no time during the events described above, and at all other pertinent times, did Defendants HULL and KUYPER have a warrant for the arrest of RANDALL JOHNSON, nor did Defendants have any facts or information that constituted probable cause that RANDALL JOHNSON had committed or was about to commit a crime.  Defendants unlawfully arrested MR. JOHNSON for being intoxicated in public, when MR. JOHNSON was not in public and was on his own property.  Further, these Defendants executed a full custodial arrest, causing MR. JOHNSON to be taken to jail.

130.     Defendants HULL and KUYPER intentionally and unlawfully exercised force to restrain, detain, and confine RANDALL JOHNSON, putting restraint on Decedent's freedom of movement, and compelled RANDALL JOHNSON to remain and/or move against his will. Defendants authorized, directed, and assisted in procuring, without process, RANDALL JOHNSON's unlawful arrest.

131.     Defendants' unlawful arrest of RANDALL JOHNSON was intended to, and did, deprive RANDALL JOHNSON of obviously necessary emergency medical/psychiatric care, and ultimately caused his death.

132.     As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Plaintiff sustained injuries and damages and is entitled to relief as set forth at ¶¶ 85-88, above.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests the following relief against each and every

Defendant herein, jointly and severally:

    a.    Compensatory and exemplary damages in an amount according to proof and which is fair, just, and reasonable;

    b.    Punitive damages under 42 U.S.C. § 1983 and California law in an amount according to proof and which is fair, just, and reasonable;

    c.    All other damages, penalties, costs, interest, and attorneys' fees as allowed by 42 U.S.C. §§ 1983 and 1988; California Code of Civil Procedure §§ 377.20 et seq., 377.60 et seq., and 1021.5; California Civil Code §§ 52 et seq., 52.1; and as otherwise may be allowed by California and/or federal law;

    d.    Declaratory and injunctive relief – including but not limited to reforms of Defendants' policies, practices, training and supervision – according to proof and which is fair, just, and reasonable;

    e.    An Order requiring Defendant CFMG to cease allowing and assigning LVN's to work outside their legal scope of practice and without sufficient supervision;

    f.    Such further relief, according to proof, that this Court deems appropriate and lawful.

## JURY DEMAND

Plaintiff hereby demands a jury trial in this action.


Dated:  August 30, 2019           HADDAD & SHERWIN LLP


                          /s/ *Julia Sherwin*
                          JULIA SHERWIN
                          Attorneys for Plaintiff