MICHAEL J. HADDAD (SBN 189114)
JULIA SHERWIN (SBN 189268)
TERESA ALLEN (SBN 264865)
HADDAD & SHERWIN LLP
505 Seventeenth Street
Oakland, CA 94612
Telephone: (510) 452-5500
Facsimile: (510) 452-5510

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

RANDALL SCOTT JOHNSON, DECEASED, by and through his Successor in Interest, KATHERINE JOHNSON, KATHERINE JOHNSON, Individually,

Plaintiff,

vs.

CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED, a California corporation; CORRECTIONAL MEDICAL GROUP COMPANIES, INC., a Delaware Corporation; WELLPATH MANAGEMENT, INC., a Delaware Corporation; WELLPATH LLC, a Delaware Limited Liability Company; KERI RUBALCAVA, R.N.; AMANDA REAM, R.N.; LINDA SMITH, R.N.; JOHN MAIKE, Psychiatric R.N.; CYNTHIA COLLINS, L.V.N.; SHELBY CALLAHAN, L.V.N.; THOMAS HAMMOND, L.V.N.; individually, jointly, and severally,

Defendants.

Case No. 2:19-cv-01722-JAM-DB

**PLAINTIFF'S TRIAL BRIEF**

**Trial Date:** June 28, 2023

TABLE OF CONTENTS


I. STATEMENT OF FACTS ........................................ 1

II. LIABILITY ........................................ 6

A. Defendants Amanda Ream, R.N., Linda Smith, R.N., John Maike, LMFT, Cynthia Collins, LVN, Shelby Callahan, LVN, and Thomas Hammond, LVN Violated Randall Johnson's Fourteenth Amendment Rights by their Objective Deliberate Indifference to his Serious Medical and Mental Health Needs ........................................ 6

B. Defendant Keri Rubalcava, R.N., Wellpath Program Manager for Shasta County, Is Liable as a Supervisor for Setting in Motion the Unconstitutional Denial of Medical Care to Randall Johnson ........................................ 10

C. Defendants CFMG, CMGC now known as Wellpath Management Inc., and Wellpath LLC Are Liable for the Individual Defendants' and Supervisor's Violation of Randall Johnson's Rights Through Their Corporate Policies, Practices, Customs, and Failures to Train their Employees ........................................ 13

D. Causation ........................................ 15

E. No Contributory Fault ........................................ 16

F. No MICRA ........................................ 17

G. No Qualified Immunity ........................................ 17

III. DAMAGES ........................................ 18

A. Compensatory Damages ........................................ 18

1. Wrongful Death Damages ........................................ 18

2. Survival Damages – Decedent's Pain and Suffering ........................................ 19

3. Survival Damages – Decedent's Loss of Life ........................................ 19

B. No Nominal Damages ........................................ 20

C. Punitive Damages ........................................ 20

## TABLE OF AUTHORITIES

<u>Federal Cases</u>

*Atencio v. Arpaio*,
161 F. Supp. 3d 789 (D. Ariz. 2015) ....................7

*Bains LLC v. ARCO Prods. Co.*,
405 F.3d 764 (9th Cir. 2005) ....................24

*Boston v. Suffolk County*,
326 F.Supp. 3d 1 (E.D.N.Y. Jan. 9, 2018) ....................7

*Bradway v. Town of South Hampton*,
826 F. Supp. 2d 458 (E.D.N.Y. 2011) ....................7

*Cabrales v. County of Los Angeles,*
864 F.2d 1454 (9th Cir. 1988),
*vacated by* 490 U.S. 1087 (1989),
*reinstated by* 886 F.2d 235 (1989) ....................14

*Castro v. Cnty. of L.A.*,
833 F.3d 1060 (9th Cir. 2016) ....................8

*Chaudhry v. City of Los Angeles*,
751 F.3d 1096 (9th Cir. 2014) ....................19

*Chew v. Gates,*
27 F.3d 1432 (9th Cir.1994) ....................20

*City of Newport v. Fact Concerts, Inc.*,
453 U.S. 247 (1981) ....................23

*Coleman v. Wilson*,
912 F. Supp. 1282 (E.D. Cal. 1995) ....................7

*Colwell v. Bannister*,
763 F.3d 1060 (9th Cir. 2014) ....................7

*Conn v. Conn v. City of Reno*,
591 F.3d 1081 (9th Cir. 2010),
*vacated by* 131 S. Ct. 1812 (2011),
*reinstated in relevant part by* 658 F.3d 897 (9th Cir. 2011) ....................8

*Cordova v. City of Albuquerque*,
816 F.3d 645 (10th Cir. 2016) ....................16

*Dang v. Cross*,
422 F.3d 800 (9th Cir. 2005) ....................20, 21

*Daniels v. Williams*,
474 U.S. 327 (1986)....8

*Davis v. Buchanon County,*
11 F.4th 604 (8th Cir. 2021) ....17

*Davis v. Mason Cty.*,
927 F.2d 1473 (9th Cir. 1991) ....24

*Dean v. City of Fresno*,
546 F.Supp. 2d 798 (E.D. Cal. 2008)....7

*Deloney v. County of Fresno*,
No. 1:17-cv-1336-LJO-EPG,
2019 U.S. Dist. LEXIS 71089 (E.D. Cal. Apr. 26, 2019)....19

*Dennis v. Higgins*,
498 U.S. 439 (1991)....20

*Dubner v. City & Cnty. of San Francisco*,
266 F.3d 959 (9th Cir. 2001) ....11

*Dushaw v. Roadway Exp., Inc.*,
816 F.Supp. 1229 (N.D. Ohio 1992)....25

*Ellis v. City of San Diego,*
176 F.3d 1183 (9th Cir. 1999) ....17

*Estate of Miller v. County of Sutter*,
No. 2:20-cv-00577-KJM-DMC,
2020 U.S. Dist. LEXIS 204517 (E.D. Cal. Oct. 30, 2020) ....18

*Estate of Prasad ex rel. Prasad v. Cty. of Sutter*,
958 F. Supp. 2d 1101 (E.D. Cal. 2013)....18

*Estelle v. Gamble*,
429 U.S. 97 (1976)....21

*Farmer v. Brennan*,
511 U.S. 825 (1994)....13

*Fricano v. Lane City*,
No. 6:16-cv-01339-MC,
2018 U.S. Dist. LEXIS 96521 (D. Ore. June 8, 2018)....7

*Gibson v. County of Washoe*,
290 F.3d 1175 (9th Cir. 2002),
*cert. denied*, 537 U.S. 1106 (2003)....passim

*Gordon v. County of Orange, ("Gordon II")*,
6 F.4th 961 (9th Cir. 2021) ....................................................................................9

*Gordon v. County of Orange*,
888 F.3d 1118 (9th Cir. 2018) ...........................................................................8, 9, 21

*Graham v. Connor*,
490 U.S. 386 (1989)..........................................................................................................8

*Hall v. County of Nemaha*,
509 F.Supp. 2d 821 (D. Neb. 2007)....................................................................................7

*Halvorsen v. Baird*,
146 F.3d 680 (9th Cir. 1998) ..............................................................................................17

*Harper v. Lawrence County*,
592 F.3d 1227 (11th Cir. 2010) ..........................................................................................7

*Hazle v. Crofoot*,
727 F.3d 983 (9th Cir. 2013) ..............................................................................................20

*Hernandez v. Cty. of Monterey*,
110 F. Supp. 3d 929 (N.D. Cal. 2015) .................................................................................7

*Hoptowit v. Ray*,
682 F.2d 1237 (9th Cir. 1982) .......................................................................................8, 13

*Howell v. NaphCare, Inc.*,
67 F.4th 302 (6th Cir. 2023) ..............................................................................................17

*Hutchinson v. United States*,
838 F.2d 390 (9th Cir. 1988) ...............................................................................................8

*In re Exxon Valdez,*
270 F.3d 1215 (9th Cir. 2001) ............................................................................................20

*Jensen v. Lane County*,
222 F.3d 570 (9th Cir. 2000) ..............................................................................................17

*Jett v. Penner*,
439 F.3d 1091 (9th Cir. 2006) ..............................................................................................7

*Jones v. Williams*,
297 F.3d 930 (9th Cir. 2002) ..............................................................................................16

*Kingsley v. Hendrickson,*
135 S. Ct. 2466 (2015).........................................................................................................8

*Liscio v. Warren*,
901 F.2d 274 (2d Cir. 1990)........7

*Long v. County of Los Angeles*,
442 F.3d 1178 (9th Cir. 2006)........14

*M.H. v. County of Alameda*,
62 F.Supp.3d 1085 (N.D. Cal. 2014)........13, 14

*M.H. v. County of Alameda*,
No. 11-cv-02868-JST,
2014 U.S. Dist. LEXIS 44852 (N.D. Cal. Mar. 31, 2014)........23

*Maxwell v. County of San Diego*,
708 F.3d 1075 (9th Cir. 2013)........11

*McHugh v. Olympia Entm't, Inc.*,
37 F. App'x 730 (6th Cir. 2002)........16

*Meeker v. Life Care Ctrs. Of Am., Inc.*,
No. 14-cv-02101-WYD-NYW,
2015 U.S. Dist. LEXIS 162989 (D. Colo. Dec. 4, 2015)........27

*Mihara v. Dean Whitter & Co., Inc.*,
619 F.2d 814 (9th Cir. 1980)........25, 26

*Miller v. Schmitz*,
No. 1:12-cv-0137 LJO,
2013 U.S. Dist. LEXIS 152491 (E.D. Cal. Oct. 23, 2013)........16

*Moreland v. Las Vegas Metro. Police Dept.*,
159 F.3d 365 (9th Cir. 1998)........18

*Morgan v. Woessner*,
997 F.2d 1244 (9th Cir. 1993)........24

*Morton v. County of San Diego*,
2022 U.S. Dist. LEXIS 4819 (S.D. Cal. Jan. 10, 2022)........19

*Neuroth v. Mendocino County, et al.*,
CAND No. 3:15-cv-03226-RS........4

*Noble v. Wells Fargo Bank, N.A.*,
771 Fed. Appx. 378 (9th Cir. May 29, 2019)........18, 20

*Pac. Mut. Life Ins. Co. v. Haslip*,
499 U.S. 1 (1991)........20, 23

*Padilla v. Beard*,
No. 2:14-cv-1118 KJM-CKD,
2017 U.S. Dist. LEXIS 11851 (E.D. Cal. Jan. 27, 2017)....................7

*Pajas v. County of Monterey*,
2016 U.S. Dist. LEXIS 88955 (N.D. Cal. July 8, 2016)....................19

*Park v. Kitt*,
No. 1:19-cv-01551-AWI,
2021 U.S. Dist. LEXIS 63168 (E.D. Cal. Mar. 31, 2021)....................16

*Peralta v. Dillard*,
744 F.3d 1076 (9th Cir. 2015)....................14

*Pooshs v. Phillip Morris USA, Inc.*,
287 F.R.D. 543 (N.D. Cal. 2012)....................23

*Provident Life & Accident Ins. Co. v. O'Connor*,
32 Fed. Appx. 821 (9th Cir. 2002)....................24

*Quezada v. County of Bernalillo*,
944 F.2d 710 (10th Cir. 1991)....................16

*Redman v. Cnty. of San Diego*,
942 F.2d 1435 (9th Cir. 1991)....................11

*Richardson v. McKnight*,
521 U.S. 399 (1997)....................17

*Riley v. Empire Airlines, Inc.*,
823 F.Supp. 1016 (N.D.N.Y. 1993)....................25

*Robertson v. Wegmann*,
436 U.S. 584 (1978)....................20

*Rodriguez v. Cty. of Los Angeles*,
96 F. Supp.3d 990 (C.D. Cal. May 29, 2014)....................24

*Russell v. Lumitap*,
31 F.4th 729 (9th Cir. 2022)....................9

*Sanchez v. Oliver*,
995 F.3d 461 (5th Cir. 2021)....................17

*Sandoval v. County of San Diego*,
985 F.3d 657 (9th Cir. 2021)....................9, 10, 14, 16

*Schlang v. Key Airlines*,
794 F.Supp. 1493 (D. Nev. 1992) .......... 25

*Smith v. Wade*,
461 U.S. 30 (1983) .......... 20

*Starr v. Baca,*
652 F.3d 1202 (9th Cir. 2011),
*cert. den'd*, 132 S. Ct. 2101 (2012) .......... 10, 11, 12

*Stevenson v. Koskey*,
877 F.2d 1435 (9th Cir. 1989) .......... 15

*Tahoe Sierra Preservation Council v. Tahoe regional Planning Agency*,
34 F.3d 753 (9th Cir. 1994) .......... 15

*Tanner v. McMurray*,
989 F.3d 860 (10th Cir. 2021) .......... 17

*Teller v. Dogge*,
2:12-cv-00591-JCM,
2013 U.S. Dist. LEXIS 52215 (D. Nev. Apr. 10, 2013) .......... 23

*Thompson v. Upshur County, Tex.*,
245 F.3d 447 (5th Cir. 2001) .......... 7

*Tri-Tron Int'l v. Velto*,
525 F.2d 432 (9th Cir. 1975) .......... 24

*Tsao v. Desert Palace, Inc*.,
698 F. 3d 1128 (9th Cir. 2012) .......... 13

*TXO Production Corp. v. Alliance Resources Corp.*,
419 S.E.2d 870 (W.Va. 1992),
*aff'd*, 509 U.S. 443 (1993) .......... 25

*TXO Products Corporation v. Alliance Res. Corporation*,
509 U.S. 443 (1993) .......... 23, 26

*Valenzuela v. City of Anaheim*,
6 F.4th 1098 (9th Cir. 2021) .......... 19, 20

*Vieste, LLC v. Hill Redwood Dev.*,
No. 09-cv-04024-JSW (DMR),
2011 U.S. Dist. LEXIS 29137 (N.D. Cal. Mar. 9, 2011) .......... 23

*Villarreal v. County of Monterey*,
254 F.Supp.3d 1168 (N.D. Cal. 2017) .......... 18

*Ward v. City of San Jose*,
967 F.2d 280 (9th Cir. 1991) .......... 19

*Watkins v. City of Oakland*,
145 F.3d 1087 (9th Cir. 1998) .......... 11

*Webb v. Ackerman*,
No. CV-13-9112-PLA,
2017 U.S. Dist. LEXIS 217146 (C.D. Cal. Sept. 26, 2017) .......... 24

*West v. Atkins*,
487 U.S. 42 (1988) .......... 13

*White v. Ford Motor Company*,
500 F.3d 963 (9th Cir. 2007) .......... 23, 25

*Woodward v. Corr. Med. Servs. of Ill., Inc.*,
368 F.3d 917 (7th Cir. 2004) .......... 15

California Cases

*Adams v. Murakami*,
54 Cal.3d 105 (1991) .......... 23, 24

*Barrett v. Superior Court*,
222 Cal. App. 3d 1176 (1990) .......... 18

*Delos v. Farmers Group, Inc.*,
93 Cal. App. 3d 642 (1979) .......... 24

*Krouse v. Graham*,
19 Cal.3d 59 (1977) .......... 18

Federal Statutes

42 U.S. Code § 1983 .......... passim

California Statutes

California Civil Code §§ 3333.1, 3333.2, et seq .......... 17

California Code of Civil Procedure § 377.34 .......... 19

California Code of Civil Procedure § 377.60 .......... 18, 19

California Penal Code § 471.5 .......... 3
California Welfare & Institutions Code § 5150 .......... 12, 15

Other Authorities

California Civil Jury Instructions (CACI) 3921 .......... 18
California Civil Jury Instructions (CACI) 430 .......... 15
California Civil Jury Instructions (CACI) 431 .......... 15
Ninth Circuit Model Civil Jury Instruction 9.2 .......... 9, 15
Ninth Circuit Model Civil Jury Instruction 9.30 .......... 8
Ninth Circuit Model Civil Jury Instruction 9.4 .......... 12

## I. STATEMENT OF FACTS

This is a civil rights, wrongful death, and survival action arising from Defendants' deliberate indifference to the serious medical and psychiatric needs of pretrial detainee, Randall Johnson, resulting in his death on August 16, 2018, at the Shasta County jail. Mr. Johnson was a 56-year-old man with a long history of alcoholism, including bouts of delirium tremens and blackouts, and past suicidal conduct and ideations. Plaintiff Katherine Johnson, Randall Johnson's sister and closest relative, is currently 60 years old.

On August 14, 2018, Randall Johnson had attempted to overdose on methamphetamine. Mr. Johnson's friend called 911 to seek emergency medical attention for Mr. Johnson. Instead, the officers arrested Mr. Johnson for public intoxication and transported him to the Shasta County Jail where they believed he would be properly assessed and treated.[1]

The transporting officer reported the following in his Probable Cause Declaration, an official record of the Shasta County Jail: that the officers observed Mr. Johnson wearing only underwear and shoes, curled into the fetal position on his left side, with feces seeping out of his underwear and feces smeared on his back and arms; that his heart was beating 130 beats per minute; that he "spoke rapidly and randomly, was overall fidgety, had rapid eyelid fluttered [sic], and constricted pupils;" that Mr. Johnson had informed the officers that "he had used $100 of methamphetamine, partially by injecting it into his system, partially by ingesting it anally" in an attempt to commit suicide, and that he had "used the methamphetamine constantly during the past three days."

The jail's security system videos recorded the entire 36-minute intake process. Upon arrival at the jail, Shasta County Jail deputies were briefed by the arresting officer about Mr. Johnson's condition. Mr. Johnson was still covered in feces at the jail, and he was nude except for boxer shorts, socks and shoes. While in the booking area of the jail, the video shows Mr. Johnson was screaming in agony, hallucinating, talking to people who were not there, talking to himself, making outbursts of incoherent statements, and informed the jail staff that, "I tried to commit suicide with $100 worth of meth." Mr. Johnson also made self-harming statements, such as "Just pull your gun out and shoot me. You'll get it done quick." "You'll make a dying man happy." "I lost my job and my career, it's time to go. I lost my girl. It's time to go.

[1] Plaintiff settled her claims against the City of Redding and Shasta County Defendants.

You're doing me a favor." "All I want is a sip of Coke, then blow me away or whatever." Mr. Johnson also made several statements about the severity of his current medical condition, such as, "I've got enough drugs in me to kill seven horses;" "You're gonna have to give me my blood pressure medication in the morning and night. It's very dangerous;" "My heart rate was so shallow that I thought there were two beats left;" "I'm about to drown in my own puke;" and "I'm sick to my stomach." As he sat handcuffed to a bench, Mr. Johnson vomited and continued to soil himself.

Shasta County's intake officer screened Mr. Johnson for admission into the jail. The arresting Redding police officer told the intake officer about the background of Mr. Johnson's arrest, including that "he had ingested what he said was around a hundred dollars of methamphetamine" and that Mr. Johnson "injected it and also ingested it anally" to try to kill himself. The intake deputy told Defendant Amanda Ream, R.N., about Mr. Johnson having ingested $100 worth of methamphetamine to try to kill himself so that she could look into that more thoroughly.

Shasta County contracts with the Wellpath entities (CFMG/CMGC/Wellpath, hereafter "Wellpath"), to provide medical, mental health, and psychiatric services at the jail. At the time of the incident, the contract for jail medical services was between Shasta County and Defendant California Forensic Medical Group (CFMG). (Plf's Trial Ex. 1). At that time, numerous witnesses will testify that CFMG had been acquired by Defendant Correctional Medical Group Companies, Inc. (CMGC), which also employed the individual medical staff defendants and provided the jail's medical policies on CMGC letterhead. CMGC later merged with another jail healthcare company to create Wellpath – now a "family" of at least 65 companies including CFMG. In connection with that merger, CMGC changed its name to (Defendant) Wellpath Management, Inc. Defendants admit that currently, CFMG is a Variable Interest Entity (VIE) of one of the companies in the Wellpath "family," CCS-CMGC Intermediate Holdings, Inc. All of the Wellpath family entities' financial information, including CFMG's, is on a single consolidated tax return for this entity. CFMG is controlled by Defendant Wellpath LLC, which siphons off CFMG's profits as "management fees" and possibly "loans." CFMG would be insolvent as a stand-alone company, but persists as a VIE due to Wellpath LLC's financial control including its absorption of CFMG's "losses" after taking millions in management fees.

Given CFMG's VIE status, Generally Accepted Accounting Principles (GAAP) require that any assessment of its current financial position must include the financial position of the controlling entities,

including Wellpath LLC.[2] On June 12, 2023, the Court ordered Defendants to produce complete financial information and tax returns for CCS-CMGC Intermediate Holdings, Inc.

Wellpath Defendant Amanda Ream, R.N., performed the jail's intake medical and mental health assessment on Randall Johnson. Ms. Ream heard most or all of Mr. Johnson's statements in the jail about recently attempting to overdose on methamphetamine by ingesting a large amount both intravenously and anally. When Nurse Ream assessed Mr. Johnson, she noted that his pulse, at 128 beats per minute, was tachycardic – an elevated pulse over 100 -- which is consistent with a cardiac arrest or other emergency.

Nurse Ream was required to ask Mr. Johnson all of the questions on the entire six-page CFMG/CMGC/Wellpath Medical Intake Triage/Receiving Screening Form. Instead, Nurse Ream performed a cursory evaluation of Mr. Johnson, only asking him a few questions. Nurse Ream failed to ask Mr. Johnson pertinent and required questions about his history of alcohol use and withdrawal, his history of drug use, and whether he had inserted any drugs into a body cavity, despite knowing that Mr. Johnson had not only injected methamphetamine, but also took it rectally, as she was informed by the intake officer.

Nurse Ream then falsified the rest of Mr. Johnson's intake form, writing "no" in response to questions she never asked, in violation of Wellpath's policy and California Penal Code § 471.5.

Ms. Ream even falsely wrote that Mr. Johnson did not drink alcohol at all. If she had asked him required questions about his alcohol use, she would have learned that he was alcohol dependent and had a history of hospitalization for alcohol withdrawal.

Rather than send Mr. Johnson to a hospital immediately, Nurse Ream decided that Mr. Johnson was medically fit to enter the jail, even though she knew that he had just tried to commit suicide by overdosing on methamphetamine intravenously and anally, was severely intoxicated, and was suffering from an obvious and serious medical and psychiatric condition. She also violated a number of Wellpath policies that required her to send Mr. Johnson to a hospital emergency room at that time. Nurse Ream knew how serious and life-threatening Mr. Johnson's condition was when she remarked during intake, as indicated on the video footage, "He's lucky he didn't have a heart attack!" Ms. Ream acknowledged that she falsified Mr. Johnson's medical record at her deposition, after being confronted with the jail video

[2] As discussed below, only a defendant's *current* financial position is relevant for punitive damages.

showing her only asking a few of the required questions.

Mr. Johnson was admitted into the jail and placed in two safety cells over the next 34 hours while being intermittently observed by medical and jail staff, including Wellpath Licensed Vocational Nurses (LVNs) working outside their legal scope of practice. An LVN's scope of practice is limited to collecting data, recording observations, and reporting those observations to a Registered Nurse or a physician. It is not within the LVN's scope of practice to function independently. Instead, LVN's must practice under the direction of a licensed physician or Registered Nurse at all times.

Wellpath routinely assigned LVNs to triage patients and do sick call assessments without supervision and without having to report their findings to an RN. Wellpath also allows LVNs to determine whether patients need to be placed into safety cells or need to be transferred to a hospital, to perform intake assessments on patients without having to call an RN or higher-level caregiver, to determine whether a patient should be admitted into the jail rather than sent to the hospital for a medical clearance, and to perform the job duties assigned to RNs, in violation of the limits on the LVN scope of practice. The LVN Defendants performed these duties despite knowing the limits on their scope of practice. This is pursuant to company policy. Wellpath saves considerable money by paying LVNs to do the work that legally must be done by Registered Nurses or higher.

On February 14, 2017, a year and a half before Randall Johnson's death, Ann Shuman of the California Board of Vocational Nursing and Psychiatric Technicians informed Wellpath that triage is outside the legal scope of practice for LVN's. (Triage is collecting data about a patient condition and then determining a level or priority of care for the patient). The Wellpath Defendants disclosed Ms. Shuman as an unretained expert in another case against Wellpath, *Neuroth v. Mendocino County, et al.* CAND No. 3:15-cv-03226-RS. The Plaintiff in *Neuroth* was represented by Plaintiff's counsel here, who deposed Ms. Shuman on February 26, 2018. The Wellpath Defendants in *Neuroth* were represented by defense counsel in this case, Jerome Varanini and Peter Bertling. Ms. Shuman reiterated in her deposition the limits on the LVN scope of practice. Defendants continued having LVN's work outside their legal scope of practice, evening scheduling LVN's to work RN shifts.

Indeed, on August 15, 2018, when LVN Shelby Callahan did her cursory independent assessments on Randall Johnson, she was working as an RN and there was no RN in the jail.

Multiple LVNs did cursory, independent assessments on Mr. Johnson without ever reporting to, or

being supervised by, a physician or RN. Wellpath staff reported that Mr. Johnson continued to exhibit signs of psychosis and distress from the large amounts of methamphetamine he had taken to commit suicide.

At times, Mr. Johnson refused to be assessed by nursing staff, and the Wellpath employees simply left him alone and failed to inform any physician or higher-level caregiver. Nobody took Mr. Johnson's vital signs for the last 22 hours of his life. Wellpath policy required that Mr. Johnson, whose condition was not improving and who refused LVN care, be transferred to a hospital. The nursing staff, consisting of Registered Nurses and LVNs, never summoned emergency medical care for Mr. Johnson, and even failed to notify a physician, physician's assistant, or nurse practitioner of Mr. Johnson's need for emergency medical care, even though they knew or must have known that Mr. Johnson had ingested large amounts of methamphetamine both intravenously and rectally to commit suicide. Additionally, at no time during his incarceration was Mr. Johnson provided appropriate alcohol and drug detoxification and withdrawal care or monitoring. His continuing presentation also was consistent with severe alcohol withdrawal.

Wellpath's Suicide Prevention Plan, and generally accepted jail standards, required that acutely suicidal inmates like Randall Johnson be provided constant, 24-hour observation, and if such observation could not be provided, that the inmate be transferred to the hospital. There are no cells in the Shasta County jail that allow for constant, 24-hour observation. Wellpath never provided the required constant observation of Mr. Johnson and never transferred him to a hospital. Wellpath also never provided the required constant observation to any acutely suicidal inmates in the jail.

Plaintiff's experts will testify that Mr. Johnson was obviously in need of acute medical and psychiatric evaluation and treatment, as he displayed overt symptoms of psychosis and medical instability such as fecal incontinence, tachycardia, vomiting, pain, disorientation, playing in his feces, and mental confusion, and that "the possible presence of methamphetamine in Mr. Johnson's rectum was a 'ticking time bomb' requiring constant medical monitoring in an acute care setting."

Early on the morning of Mr. Johnson's death, jail deputies and Defendant Thomas Hammond, LVN, observed Mr. Johnson "covered in bruises," in great pain, still covered in feces, and disoriented to time and place. On his own and without supervision, Mr. Hammond ignored multiple signs that Mr. Johnson was medically and psychiatrically unstable, and determined that Mr. Johnson was medically fit to

remain in the jail.

Thirty-four hours after arriving at the Shasta County jail, Mr. Johnson was found dead on the floor of his segregated cell, cold to the touch and pulseless. The County Coroner determined that the cause of death was "Toxic effects of methamphetamine" and the manner of death was "Suicide." Defendants' objective deliberate indifference to Randall Johnson's serious medical needs brought about his slow-motion suicide.

Plaintiff Johnson's Emergency Medicine expert, Martin Chenevert, M.D., will testify that "had Mr. Johnson been taken to the Emergency Room at the time of his arrest *or any time prior to his death*, he would, with a high degree of medical probability, still be alive today."

## II. LIABILITY

The remaining claims against the Wellpath medical defendants are § 1983 claims for violation of decedent Randall Johnson's Fourteenth Amendment right to medical and psychiatric care in jail:

1. Objective deliberate indifference to Randall Johnson's serious medical and psychiatric needs claim against Defendants Ream, Smith, Maike, Collins, Callahan, and Hammond;
2. Supervisory liability claim against Wellpath Program Manager Rubalcava for violations of Randall Johnson's right to adequate medical/psychiatric care in jail;
3. *Monell* claim against all Wellpath corporate Defendants based on their policies, practices, customs and failures to train that were a moving force in their employees' violations of Randall Johnson's rights.

Plaintiff has voluntarily dismissed her state law claims under the Bane Act.

### A. Defendants Amanda Ream, R.N., Linda Smith, R.N., John Maike, LMFT, Cynthia Collins, LVN, Shelby Callahan, LVN, and Thomas Hammond, LVN Violated Randall Johnson's Fourteenth Amendment Rights by their Objective Deliberate Indifference to his Serious Medical and Mental Health Needs

"[T]he Fourteenth Amendment ensures that states will provide not only for the medical needs of those in penal settings, but for anyone restricted by a state from obtaining medical care on his own." *Gibson v. County of Washoe*, 290 F.3d 1175, 1188, n. 9 (9th Cir. 2002), *cert. denied*, 537 U.S. 1106 (2003). "This duty to provide medical care encompasses detainees' psychiatric needs." *Id*, at 1187.

To prevail on a claim of deliberate indifference against an official, a plaintiff must demonstrate that (1) he had a serious medical need, (2) the official was deliberately indifferent to that need, and (3) this

indifference caused him harm. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

A serious medical need is one which, without treatment, "could result in further significant injury or the unnecessary and wanton infliction of pain." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014). "Indications that a plaintiff has a serious medical need include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'" *Id.*

"An inmate exhibiting symptoms of psychosis has established a serious medical need for purposes of the objective prong of a deliberate indifference claim." *Padilla v. Beard*, No. 2:14-cv-1118 KJM-CKD, 2017 U.S. Dist. LEXIS 11851 at *45-46 (E.D. Cal. Jan. 27, 2017) (citing *Atencio v. Arpaio*, 161 F. Supp. 3d 789, 811 (D. Ariz. 2015); *Coleman v. Wilson*, 912 F. Supp. 1282, 1321 (E.D. Cal. 1995) (defendants exhibited deliberate indifference to inmates' psychotic condition by placing them in segregated housing)). See also, *Fricano v. Lane City*, No. 6:16-cv-01339-MC, 2018 U.S. Dist. LEXIS 96521 at *21, n. 4 (D. Ore. June 8, 2018) ("Mr. Fricano's serious medical need was his psychosis").

A drug overdose is obviously a serious medical condition. See, *Bradway v. Town of South Hampton*, 826 F. Supp. 2d 458, 471-73 (E.D.N.Y. 2011) (decedent suffered from a serious medical need due to evidence he had recently consumed large quantities of cocaine); *Dean v. City of Fresno*, 546 F.Supp. 2d 798, 814 (E.D. Cal. 2008) (undisputed, and court agreed, that if officers knew decedent had swallowed cocaine, decedent had serious medical need); *Hall v. County of Nemaha*, 509 F.Supp. 2d 821, 832 (D. Neb. 2007) (where officers knew that decedent had swallowed drugs, "it was obvious that [decedent] had a serious medical need for treatment of that overdose"); *Boston v. Suffolk County*, 326 F.Supp. 3d 1, 20 (E.D.N.Y. Jan. 9, 2018) (officers were required to reasonably address plaintiff's serious medical need where officers were aware of ingestion of large quantity of drugs and plaintiff had fallen asleep, had vomited, had slurred speech, was lethargic and unsteady, and looked like a "zombie").

Alcohol withdrawal is a serious medical need. *Thompson v. Upshur County, Tex.*, 245 F.3d 447, 457 (5th Cir. 2001). See also, *Harper v. Lawrence County*, 592 F.3d 1227, 1235-37 (11th Cir. 2010) (denying qualified immunity where decedent did not receive any medical care for his severe alcohol withdrawal); *Liscio v. Warren*, 901 F.2d 274, 276-77 (2d Cir. 1990) (doctor failed to inquire into cause of arrestee's delirium and failed to diagnose alcohol withdrawal); *Hernandez v. Cty. of Monterey*, 110 F. Supp. 3d 929, 948 (N.D. Cal. 2015) ("Withdrawal is a serious and potentially deadly medical condition,

with symptoms including seizures, hallucinations, agitation and increased blood pressure.”).

“A heightened suicide risk or an attempted suicide is [also] a serious medical need.” *Conn v. Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir. 2010), *vacated by* 131 S. Ct. 1812 (2011), *reinstated in relevant part by* 658 F.3d 897 (9th Cir. 2011).

Next, a pretrial detainee must show the defendant officials were objectively deliberately indifferent to that serious medical need. *Gordon v. County of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018). To demonstrate objective deliberate indifference, a pretrial detainee must show: “(1) [t]he defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) [t]hose conditions put the plaintiff at substantial risk of suffering serious harm; (3) [t]he defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (4) [b]y not taking such measures, the defendant caused the plaintiff's injuries.” *Id,* (see also Ninth Circuit Model Civil Jury Instr. 9.30). *Gordon* explains:

> “With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily ‘turn[ ] on the facts and circumstances of each particular case.’” [*Castro*, 833 F.3d ] at 1071 (quoting *Kingsley*, 135 S. Ct. at 2473; *Graham v. Connor*, 490 U.S. 386, 396 [ ] (1989)). The “‘mere lack of due care by a state official’ does not deprive an individual of life, liberty, or property under the Fourteenth Amendment.” *Id.* (quoting *Daniels*, 474 U.S. at 330-31). Thus, the plaintiff must “prove more than negligence but less than subjective intent—something akin to reckless disregard.” *Id*.

Deliberate indifference may be shown where prison officials or practitioners “deny, delay, or intentionally interfere with medical treatment.” *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). Additionally, “[a]ccess to the medical staff has no meaning if the medical staff is not competent to deal with the prisoners’ problems. The medical staff must be competent to examine prisoners and diagnose illnesses.” *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982). Defendants’ provision and scheduling of LVNs to handle complex decision-making that only RNs or higher may do clearly fits within this well-established liability framework.

Deliberate indifference also can be proven by the failure to medically screen a new jail inmate with serious medical needs. *Gibson,* 290 F.3d at 1189-93. Under the old, higher, subjective deliberate indifference standard, *Gibson* held that a jury could find a constitutional violation by an intake nurse who “knew that [the plaintiff] was in the throes of a manic state” but “fail[ed] to provide for the identification

of [his urgent mental health] needs." *Id.* at 1193-96 "[A] pretrial detainee's right to proper medical screening was clearly established." *Gordon v. County of Orange, ("Gordon II")*, 6 F.4th 961, 970 (9th Cir. 2021) (jury could find that nurse failed to use "the proper medical screening form to ensure the initiation of a medically appropriate protocol").

Defendants also repeatedly violated Wellpath policies and training that required Mr. Johnson to be sent to a hospital. While there is "no § 1983 liability for simply acting contrary to prison policy," the standardized medical procedures of a prison can "help to underscore" that prison officials "had access to facts from which a reasonable person would infer" that a particular patient "was at serious medical risk." *Russell v. Lumitap*, 31 F.4th 729, 742 (9th Cir. 2022) (quoted in Comment to Model Instr. 9.2). See also *Sandoval v. County of San Diego*, 985 F.3d 657 (9th Cir. 2021) (sheriff department's jail medical policy manual was relevant to show defendant nurses' conduct in violation of policy was objectively unreasonable under the Fourteenth Amendment).

*Sandoval* is instructive. There, an arrestee was brought to jail overdosing on a large amount of methamphetamine he had swallowed during his arrest to prevent its discovery. 985 F.3d at 662. Unlike here, in *Sandoval*, neither the arresting officers nor jail medical staff knew that the arrestee, Mr. Sandoval, had swallowed the methamphetamine. *Id*. Instead, Mr. Sandoval was "sweating a lot and appeared to be very tired and disoriented." *Id*. After Sandoval had been cleared to enter the jail, due to his sweating, disorientation, and lethargy, an arresting officer asked jail nurse De Guzman to "look at him more thoroughly." *Id*. Nurse De Guzman gave Sandoval a second, very quick, blood sugar test which came back normal, then left Sandoval in a cell for six hours without further observation. *Id*, at 663.

The Ninth Circuit reversed the grant of summary judgment on the Fourteenth Amendment medical needs claim. Due the similarity with the facts here, the Court's analysis bears repeating:

> Applying the *Gordon* framework, a jury could conclude that a reasonable nurse who was told that Sandoval was shaking, tired, and disoriented—and who was specifically directed by a deputy to evaluate Sandoval "more thoroughly"—would have understood that Sandoval faced a "substantial risk of suffering serious harm." *Gordon*, 888 F.3d at 1125. Sweating and being so disoriented that officers observe and comment about it are not everyday conditions. A jury could further conclude that de Guzman's actions toward Sandoval—which were limited to administering a quick blood test and then ignoring Sandoval for the remaining six hours of his shift—were "akin to reckless disregard." *Id.* De Guzman is therefore not entitled to summary judgment on liability.

985 F.3d at 670. The Court also reversed summary judgment for two other nurses who failed to summon paramedics for Mr. Sandoval after he suffered a seizure, in violation of the jail's medical policy. *Id*.

Although qualified immunity cannot apply to these private medical Defendants, after reviewing a number of prior cases, the *Sandoval* Court concluded:

> The rule reflected in these decisions is clear: a prison official who is aware that an inmate is suffering from a serious acute medical condition violates the Constitution when he stands idly by rather than responding with reasonable diligence to treat the condition.

*Id*, at 679-80.

The evidence will show that Defendants Amanda Ream, R.N., Linda Smith, R.N., John Maike, LMFT, Cynthia Collins, LVN, Shelby Callahan, LVN, and Thomas Hammond, LVN each knew of Randall Johnson's serious medical needs and his substantial risk of harm when they repeatedly screened and assessed him at intake and throughout his stay, yet failed to take reasonable measures to abate or reduce that risk of harm, contributing to his death. This evidence is more than is now required under the objective deliberate indifference standard. Each of these Defendants (1) made an intentional decision to deprive Mr. Johnson of needed medical care each time they screened and assessed him; (2) that denial of care objectively put Randall Johnson at substantial risk of suffering serious harm or death; (3) each defendant did not take reasonable available measures to abate or reduce the risk of serious harm, in violation of multiple jail and Wellpath policies, and even though a reasonable medical or mental health professional under the circumstances would have understood the high degree of risk involved—making the consequences of the defendant's conduct obvious, and (4) the defendant's conduct was a substantial factor in causing Randall Johnson's injuries and death.

### B. Defendant Keri Rubalcava, R.N., Wellpath Program Manager for Shasta County, Is Liable as a Supervisor for Setting in Motion the Unconstitutional Denial of Medical Care to Randall Johnson

Defendant Keri Rubalcava, R.N. was CFMG/CMGC/Wellpath's Program Manager at the Shasta County Jail at the time of Randall Johnson's death. She runs Defendants' jail medical program at the jail, including scheduling medical and mental health staff, training medical and mental health staff, supervising nursing staff, and occasionally doing patient assessments.

The Ninth Circuit has long held that a supervisor "need not be 'directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury.'" *Starr v. Baca,* 652 F.3d 1202, 1205-06 (9th Cir. 2011), *cert. den'd*, 132 S. Ct. 2101 (2012). *Starr* held that the sheriff – who was not present, had no advance knowledge, and was not involved in any investigation or review of the alleged violations of rights – could be liable in his individual capacity "because he knew or

should have known about the dangers in the Los Angeles County Jail, and that he was deliberately indifferent to those dangers." *Id.* at 1204-05. The evidence will show that Defendant Rubalcava not only knew, but was responsible for systematically scheduling LVNs for RN shifts, for scheduling LVN's to work alone and independently, for failing to provide RN or physician supervision for LVN's, and for failing to supervise LVNs on her own shift when she was the only RN on duty.

"A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr* at 1208-09.

> "The requisite causal connection can be established . . . by setting in motion a series of acts by others," *id*. (alteration in original; internal quotation marks omitted), or by "knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury," *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001). "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998) (internal alteration and quotation marks omitted).

*Id*. See also *Maxwell v. County of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013) (supervisor "knew of the violations and failed to act to prevent them.").

The *Starr* Court illustrated supervisory liability with *Redman v. Cnty. of San Diego*, 942 F.2d 1435 (9th Cir. 1991), where the plaintiff alleged the facility where he was confined was overcrowded, "the Sheriff knew the facility was not a proper place to detain him and posed a risk of harm but placed him there anyway," and the Sheriff "was ultimately in charge of the facility's operations." *Starr*, 652 F.3d at 1208 (citing *Redman*, 942 F.2d at 1446-47). Thus, "a reasonable jury could have found the Sheriff was deliberately indifferent to the plaintiff's safety," because a jury could have found the Sheriff "knew or reasonably should have known of the overcrowding and that he acquiesced in a deficient policy that was a moving force behind the harm caused to the plaintiff." *Id*.

The *Redman* analogy applies here where Ms. Rubalcava acquiesced in, and in fact carried out, a deficient policy that was a moving force behind the harm caused to Mr. Johnson. Ms. Rubalcava understood the very limited scope of practice of a Licensed Vocational Nurse merely to "record and report" data to Registered Nurses and providers. (Rubalcava Dep., 15:21 – 16:15). She knew that LVNs

were not permitted to triage or assess patients, or determine whether a patient needs to go out to the hospital versus staying in jail. Ms. Rubalcava knew that LVN's, by law, were required to be "supervised by an RN or a higher-level caregiver at all times." *Id*. Per the CFMG/Shasta County contract, every weekend day shift had only two LVNs working together, with no supervision. During the week, the day shift LVN's supervising RN was supposed to be Ms. Rubalcava, but she rarely left her office due to her administrative duties, leaving an LVN to work the floor, or jail intake, alone. In fact, Ms. Rubacava would regularly schedule LVNs to cover an "RN shift" at the jail, even when per the contract, only one RN and one LVN were scheduled to handle all 482 patients in the jail, leaving two LVNs to work alone, unsupervised. Defendant Shelby Callahan, LVN was scheduled to work four afternoon "RN shifts" during the week that Mr. Johnson was at the jail. The LVNs in this case testified that Defendants frequently require them to do the work of RNs, without supervision, and they in fact did so on Mr. Johnson.

Wellpath's use of LVNs to handle the work of RNs, facilitated and carried out by Ms. Rubalcava, was both ingrained in the CFMG contract and in the widespread custom and practice at the jail.

As Program Manager, Ms. Rubalcava also presided over Wellpath's failure to provide obviously needed training to jail, medical and mental health staff, including on LVN's scope of practice, Cal. Welf. & Inst. Code § 5150 procedures for gravely disabled inmates, symptoms and treatment of drug overdoses, recognition of potentially life-threatening substance intoxication, and caring for patients with co-occurring mental health issues and substance-use disorders.

In addition, Ms. Rubalcava charted no supervision of Defendant Cynthia Collins, LVN, for the two times during her shift that Ms. Collins reported assessing Randall Johnson in the safety cell on August 15, 2018. And, after Ms. Rubalcava learned of Defendant Amanda Ream RN's many violations of medical policies including her falsification of Randall Johnson's medical records, she had no criticism of how Ms. Ream handled Randall Johnson's intake assessment.

A jury can find "a sufficient causal connection between [Ms. Rubalcava's] wrongful conduct and the constitutional violation" (*Starr*, 652 F.3d 1208-09), in any of the several ways permitted in Ninth Circuit Model Civil Jury Instr. 9.4.

### C. Defendants CFMG, CMGC now known as Wellpath Management Inc., and Wellpath LLC Are Liable for the Individual Defendants' and Supervisor's Violation of Randall Johnson's Rights Through Their Corporate Policies, Practices, Customs, and Failures to Train their Employees

An independent contractor performing medical services to prisoners is engaged in state action, for which liability can attach under § 1983. *West v. Atkins*, 487 U.S. 42, 54-56 (1988). The Wellpath Defendants do not dispute that, through their staff at the Shasta County Jail, they acted under color of law. (See Pretrial Order, doc. 177, p. 11, Stipulation 2). Because the Wellpath Defendants are private entities contracting to perform a public function at the jail, they are subject to a *Monell* standard for liability under § 1983. *M.H. v. County of Alameda*, 62 F.Supp.3d 1085, 1085-86 (N.D. Cal. 2014) (citing *Tsao v. Desert Palace, Inc*., 698 F. 3d 1128, 1139 (9th Cir. 2012)). *M.H. v. County of Alameda* is a factually similar case brought by Plaintiff's counsel against another corporate jail medical company that assigned LVNs to work unsupervised at a jail, leading to an inmate's death.[3]

"There are two types of official policies, customs, or patterns that may lead to *Monell* liability: 'policies of action and inaction.'" *M.H.*, 62 F.Supp.3d at 1081 (citing *Tsao*, 698 F.3d at 1143). "Policies of action are those that result in the municipality itself violating someone's constitutional rights or instructing its employees to do so." *Id*. "By contrast, policies of inaction are those that result, through omission, in the municipality's responsibility 'for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation.'" *Id*. (citing *Gibson*, 290 F.3d at 1186).

To establish a *Monell* claim, in addition to a constitutional violation, the policy must amount to objective deliberate indifference to the plaintiff's rights: "To prove deliberate indifference on the part of a municipality, the plaintiff must show that the municipality was on actual or constructive notice that its omission would likely result in a constitutional violation." *Id*. (citing *Farmer*, 511 U.S. at 841).

"In order to comply with their duty not to engage in acts evidencing deliberate indifference to inmates' medical and psychiatric needs, jails must provide medical staff who are 'competent to deal with prisoners' problems.'" *Gibson*, 290 F.3d at 1187. See also *Hoptowit*, 682 F.2d at 1253 ("Access to the

---

[3] That case resolved after one week of trial for $8.3 million plus agreed statewide reforms with a consent decree requiring the medical contractor, Corizon, to have RNs or higher-level caregivers conduct all jail receiving screenings and assessments at all jails where it worked throughout the State of California.

medical staff has no meaning if the medical staff is not competent to deal with the prisoners' problems. The medical staff must be competent to examine prisoners and diagnose illnesses."). The *M.H.* court found that a *Monell* claim could be shown where the jail medical company provided a licensed vocational nurse rather than a registered nurse to screen jail inmates at intake. *M.H.* 62 F.Supp.3d at 1087-88. *M.H.* also rejected the medical company's causation argument that an RN would have made the same intake decisions as the LVN made, based, in part, on *Gibson*: "[a]n evaluation by a trained medical staff member surely would have revealed [the decedent's] condition." *Id*. (citing 290 F.3d at 1189-90).

See also, *Cabrales v. County of Los Angeles,* 864 F.2d 1454, 1460-61 (9th Cir. 1988), *vacated by* 490 U.S. 1087 (1989), *reinstated by* 886 F.2d 235 (1989) (holding Los Angeles County's practice of medical understaffing at the jail contributed to mentally ill detainee's lack of treatment and subsequent suicide, giving rise to liability); *Peralta v. Dillard*, 744 F.3d 1076, 1084 (9th Cir. 2015) (en banc) ("A chronic shortage of resources may well amount to a policy or practice for which monetary relief may be available under *Monell*").

Deliberate indifference also can be proven by the failure to medically screen a new jail inmate with serious medical needs. *Gibson,* 290 F.3d at 1189–93. The Wellpath Defendants had a policy and widespread practice to not provide competent medical staff to screen patients.

A municipality's failure "adequately to train its employees to implement a facially valid policy can amount to deliberate indifference." *Long v. County of Los Angeles*, 442 F.3d 1178, 1188 (9th Cir. 2006). A plaintiff can prove a "failure-to-train" claim against a municipality "without showing a pattern of constitutional violations where a 'violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" *Id.*, at 1186. Even where trained medical professionals are involved, the County and medical providers may be held liable where their failure to train their employees amounts to deliberate indifference. *Id.,* at 1187.

Indeed, for any *Monell* claim, a plaintiff only has to show that the entity-defendant "had actual or constructive knowledge that its practices were substantially certain to cause a constitutional violation. [ ] This standard does not require proof of a prior injury. A constitutional injury can be substantially certain to follow from a practice even if an injury has yet to occur. Otherwise, every *Monell* defendant would get 'one free . . . pass' for policies or practices that are substantially certain to violate an individual's constitutional rights." *Sandoval*, 985 F.3d at 682 (quoting *Woodward v. Corr. Med. Servs. of Ill., Inc.*,

368 F.3d 917, 929 (7th Cir. 2004) (cleaned up)).

As set forth above, CFMG and CMGC inadequately staffed the Shasta County Jail and routinely assigned LVNs to perform the work of RNs, alone and unsupervised, in blatant disregard of the law. The evidence further will support that the Wellpath Defendants financially profited from this scheme. In addition, CFMG and CMGC failed to train jail employees on several key subjects where the need for such training, and the risks to inmate safety, were obvious, including on: LVNs' scope of practice, W&I § 5150 procedures for gravely disabled inmates, symptoms and treatment of drug overdoses, recognition of potentially life-threatening substance intoxication, caring for patients with co-occurring mental health issues and substance-use disorders, and other issues.

And in addition, CFMG and CMGC did not supervise it employees, especially LVNs, but also others, thereby allowing its written policies to be routinely violated. For example, Defendants' Suicide Prevention Policy G05 (Plf's Tr. Ex. 35) required acutely suicidal inmates – as all agree Randall Johnson was – to be placed on 24/7 direct, continuous, uninterrupted observation, or if that was not possible, then to transfer the person to a hospital. Yet, there was no cell in the Shasta County jail that allowed for constant observation, the Wellpath Defendants refused to provide constant observation, and they did not send such patients to the hospital as their own written policy required.

"Whether a local government has displayed a policy of deliberate indifference to the constitutional rights of its citizens is generally a jury question." *Gibson*, 290 F.3d at 1194-1195.

**D. Causation**

Causation is a question of fact. *Tahoe Sierra Preservation Council v. Tahoe regional Planning Agency*, 34 F.3d 753, 756 (9th Cir. 1994) (in a § 1983 action, "causation is preeminently a question of fact"). The official comment to Ninth Circuit Model Civil Jury Instruction 9.2 [Causation] cites *Stevenson v. Koskey*, 877 F.2d 1435, 1438 (9th Cir. 1989), "noting that federal courts turn to common law of torts for causation in civil rights cases." The Ninth Circuit Model Civil Jury Instructions do not include a causation instruction, only a comment at 9.2. Plaintiff proposes to use CACI instructions 430 (Causation – Substantial Factor) and 431 (Causation – Multiple Causes).

As the Comment to 9.2 also notes: "In *Jones v. Williams*, the Ninth Circuit affirmed a defense verdict in a § 1983 case in which the district judge gave the following 'concurrent cause' instruction to address allegations of supervisory and group liability: '[M]any factors or things or the conduct of two or

more persons can operate at the same time either independently or together to cause injury or damage and in such a case each may be a proximate cause.' *Jones v. Williams*, 297 F.3d 930, 937 n.6 (9th Cir. 2002)."

This explanation of multiple causes is necessary in this case due to the large number of actors whose conduct potentially caused Randall Johnson's injuries and death, including former defendants such as County and City officers who have settled claims against them.

As for application of causation here, *Sandoval* found that the evidence was "sufficient to create a genuine dispute of material fact as to whether the County's practices caused Sandoval's death" where evidence suggested that (1) Sandoval would have received more frequent monitoring had the County had proper policies in place; (2) a jury could find that had Sandoval been properly monitored, "his deteriorating medical condition would have been discovered earlier;" and (3) the plaintiff's medical expert opined that Sandoval "likely would have survived the overdose if he had been taken to the hospital at any time before he went into cardiac arrest." 985 F.3d at 681-82. Similarly here, Plaintiff's Emergency Medicine expert will testify that "had Mr. Johnson been taken to the Emergency Room at the time of his arrest *or any time prior to his death*, he would, with a high degree of medical probability, still be alive today."

**E. No Contributory Fault**

This Court granted Plaintiff's proposed motion in limine re: "any claimed contributory fault of any other person or entity, as contributory fault is not a defense to the intentional torts at issue." (Doc. 177, Pretrial Order, p. 3, item 4).

"Contributory negligence or contributory fault is an inapplicable defense to a § 1983 claim." *Park v. Kitt*, No. 1:19-cv-01551-AWI, 2021 U.S. Dist. LEXIS 63168 at *8; 2021 WL 1210364 (E.D. Cal. Mar. 31, 2021) (citing *Cordova v. City of Albuquerque*, 816 F.3d 645 (10th Cir. 2016); *McHugh v. Olympia Entm't, Inc.*, 37 F. App'x 730, 736 (6th Cir. 2002); *Quezada v. County of Bernalillo*, 944 F.2d 710, 721 (10th Cir. 1991)). See also *Miller v. Schmitz*, No. 1:12-cv-0137 LJO, 2013 U.S. Dist. LEXIS 152491 at *15; 2013 WL 5754945 (E.D. Cal. Oct. 23, 2013) ("Concepts of comparative fault or indemnification are not applicable in actions filed under 42 U.S.C. § 1983."); *Johnson v. County of San Diego*, No. 05-CV-02233-H (WMC), 2007 U.S. Dist. LEXIS 66273, at *2–3 (S.D. Cal. Aug. 24, 2007) (no apportionment in § 1983 action for plaintiff's comparative fault).

### F. No MICRA

Defendants have repeatedly and incorrectly asserted that this case is subject to MICRA (Medical Injury Compensation Reform Act of 1975, Cal. Civ Code §§ 3333.1, 3333.2, et seq.) rules and caps for medical malpractice cases under California law. To the contrary, the Ninth Circuit has held, "MICRA simply has no application to suits for violations of federal constitutional rights pursuant to 42 U.S.C. § 1983." *Ellis v. City of San Diego,* 176 F.3d 1183, 1191 (9th Cir. 1999).

### G. No Qualified Immunity

The qualified immunity defense can only be asserted by an individual government employee in connection with § 1983 claims for damages. The private Wellpath Defendants and their employees cannot assert a qualified immunity defense even though they were engaged in a public function. *Richardson v. McKnight*, 521 U.S. 399, 412 (1997) (private prison guards, unlike those working directly for the government, do not enjoy immunity from suit under § 1983).

See also *Sanchez v. Oliver*, 995 F.3d 461, 468 (5th Cir. 2021) ("all of our sister circuits to have considered the issue have found no compelling history of immunity for private medical providers in a correctional setting."); *Howell v. NaphCare, Inc.,* 67 F.4th 302, 317, n. 4 (6th Cir. 2023) ("Nurses employed by a private medical provider, like NaphCare, are not entitled to assert qualified immunity."); *Davis v. Buchanon County,* 11 F.4th 604, 616-23 (8th Cir. 2021) (while employees of private jail medical company Corizon were state actors for purposes of § 1983, they are not entitled to assert qualified immunity defense); *Tanner v. McMurray*, 989 F.3d 860, 867 (10th Cir. 2021) (employees of private corporations providing medical care in correctional facilities are not entitled to assert qualified immunity defense); *Jensen v. Lane County*, 222 F.3d 570, 576-79 (9th Cir. 2000) (private physician hired by the state to perform psychiatric exams of detainees for involuntary commitment not entitled to assert qualified immunity defense); *Halvorsen v. Baird*, 146 F.3d 680 (9th Cir. 1998) (private detox center performing quasi-governmental function not entitled to assert qualified immunity defense).

## III. DAMAGES

### A. Compensatory Damages

Plaintiff Katherine Johnson claims wrongful death and survival damages.

#### 1. Wrongful Death Damages

Under California law, a decedent's spouse, child, or other person entitled to intestate succession, may assert a cause of action when a decedent's death is "caused by the wrongful act or neglect of another." Cal. Code. Civ. Proc. § 377.60. See *Moreland v. Las Vegas Metro. Police Dept.*, 159 F.3d 365, 370 (9th Cir. 1998) (Fourth Amendment claims for death can be brought pursuant to §377.60 by "any of a defined list of persons"). Plaintiff Katherine Johnson was decedent Randall Johnson's sister and his closest relative, as Mr. Johnson was not married, had no children, and his parents are deceased. Katherine Johnson is entitled to intestate succession. Therefore, Katherine Johnson has standing to bring a wrongful death claim here. Defendants acknowledge that Plaintiff Katherine Johnson, as Decedent's sister and entitled to the property of the Decedent by intestate succession is "eligible to bring a wrongful death action under CCP § 377.60." (Doc. 222, p. 8:1-3).

"The term 'wrongful act as used in section 377 means any kind of tortious act,' including not only acts of negligence, but also acts of intentional or willful misconduct." *Estate of Prasad ex rel. Prasad v. Cty. of Sutter*, 958 F. Supp. 2d 1101, 1124 (E.D. Cal. 2013) (quoting *Barrett v. Superior Court*, 222 Cal. App. 3d 1176, 1191 (1990)); See also *Noble v. Wells Fargo Bank, N.A.*, 771 Fed. Appx. 378, 379 (9th Cir. May 29, 2019) (same). **"A wrongful death claim may be based on a federal claim of deliberate indifference under § 1983."** *Estate of Miller v. County of Sutter*, No. 2:20-cv-00577-KJM-DMC, 2020 U.S. Dist. LEXIS 204517, 2020 WL 6392565, at *16 (E.D. Cal. Oct. 30, 2020).

It is well-established that a federal due process claim for deliberate indifference to a decedent's medical needs can be the wrongful act underlying a California wrongful death claim. See *Villarreal v. County of Monterey*, 254 F.Supp.3d 1168, 1191 (N.D. Cal. 2017) (§ 1983 Fourteenth Amendment claim for denial of medical needs "can for the basis for a claim for wrongful death"); *Estate of Prasad*, 958 F. Supp. 2d at 1118 ("Here, Plaintiffs allege that each of the [defendants] were deliberately indifferent to [the decedent's] serious medical needs, and that their deliberate indifference caused [the decedent's] preventable death. These allegations suffice to state a claim for wrongful death."); *Pajas v. County of*

*Monterey*, 2016 U.S. Dist. LEXIS 88955, 2016 WL 3648686, at *30 (N.D. Cal. July 8, 2016) ("Plaintiffs argue, and the . . . Defendants do not dispute, that a claim for wrongful death may be premised on deliberate indifference to medical needs."); *Morton v. County of San Diego*, 2022 U.S. Dist. LEXIS 4819; 2022 WL 104279 (S.D. Cal. Jan. 10, 2022) ("Plaintiffs' § 1983 claims [based on Fourteenth Amendment denial of medical care] survive County Defendants' motion to dismiss and therefore can plausibly serve as a basis for Plaintiffs' wrongful death claim."); *Deloney v. County of Fresno*, No. 1:17-cv-1336-LJO-EPG, 2019 U.S. Dist. LEXIS 71089, at *28-29, 2019 WL 1875588 (E.D. Cal. Apr. 26, 2019) (concluding that because Plaintiff alleged sufficient facts to state a § 1983 claim for deliberate indifference, "it follows that Plaintiff has sufficiently pled the [Cal. Code Civ. Proc.] § 377.60 wrongful death claim").

Defendants' reliance on *Ward v. City of San Jose*, 967 F.2d 280, 284 (9th Cir. 1991), is inapt. *Ward* does not even address a wrongful death claim based on a Fourteenth Amendment denial of medical needs in jail. *Ward* simply held that a sibling may not bring a familial association claim. *Id*.

Ms. Johnson does not claim loss of economic support from her brother, Randall. Plaintiff Katherine Johnson is entitled to recover noneconomic damages for "[t]he loss of [Randall Johnson's] love, companionship, comfort, care, assistance, protection, affection, society, and moral support." CACI § 3921; *Krouse v. Graham*, 19 Cal.3d 59, 67-69 (1977).

**2. Survival Damages – Decedent's Pain and Suffering**

The decedent's pain and suffering is compensable as survival damages in a § 1983 case. See *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014) (reaffirming that the estate recovers for the decedent's pre-death pain and suffering and that the limitation on damages in C.C.P. § 377.34 does not apply in §1983 wrongful death and survival actions due to the remedial purposes of §1983).

**3. Survival Damages – Decedent's Loss of Life**

The decedent's loss of life is compensable as survival damages in a § 1983 case. See *Valenzuela v. City of Anaheim*, 6 F.4th 1098, 1103-04 (9th Cir. 2021) (following *Chaudhry*, the prohibition of loss of life damages in California's survival statute, C.C.P. § 377.34 , was inconsistent with the "remedial purpose" of § 1983).

In *Valenzuela*, the Ninth Circuit noted:

> Section 1983 was meant to be a remedial statute and should be "broadly construed" to provide a remedy "against all forms of official violation of federally protected rights." *Dennis v. Higgins*, 498 U.S. 439, 445 [ ] (1991) (citation omitted) …. [And] Section

> 1983's goals include compensation for those injured by a deprivation of federal rights and deterrence to prevent future abuses of power. *Robertson v. Wegmann*, 436 U.S. 584, 591 [ ] (1978).

*Valenzuela*, 6 F.4th at 1102.

**B. No Nominal Damages**

As explained in the Comment to Ninth Circuit Model Civil Jury Instruction 5.6, "[n]ominal damages are not available in every case. The court must determine whether nominal damages are permitted. See, e.g., *Chew v. Gates,* 27 F.3d 1432, 1437 (9th Cir.1994) (Section 1983 action) …. When a plaintiff has indisputably suffered an actual injury, an award of compensatory damages is mandatory. *Hazle v. Crofoot*, 727 F.3d 983, 991-92 (9th Cir. 2013)."

**C. Punitive Damages**

Punitive damages are permitted against an individual or corporate defendant in a § 1983 case. *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005) (citing *Smith v. Wade*, 461 U.S. 30, 49 (1983)).

In contrast to California law, the standard of proof for punitive damages for federal claims, as "the standard of proof generally applied in federal civil cases, is preponderance of evidence." *In re Exxon Valdez,* 270 F.3d 1215, 1232 (9th Cir. 2001) (applying preponderance of evidence standard) (citing *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23 n.11 (1991)). See also *Dang*, 422 F.3d at 807-08 (approving jury instruction that required proof for punitive damages in a § 1983 case by "a preponderance of the evidence," agreeing with cases from other circuits).

Punitive Damages under federal law are available where "the defendant's conduct that harmed the plaintiff was malicious, oppressive or in reckless disregard of the plaintiff's rights." *Dang*, 422 F.3d at 807.

> Conduct is malicious if it is accompanied by ill will, or spite, or if it is for the purpose of injuring the plaintiff. **Conduct is in reckless disregard of the plaintiff's rights if, under the circumstances, it reflects complete indifference to the plaintiff's safety or rights, or if the defendant acts in the face of a perceived risk that its actions will violate the plaintiff's rights under federal law.** An act or omission is oppressive if the defendant injures or damages or otherwise violates the rights of the plaintiff with unnecessary harshness or severity, such as by the misuse or abuse of authority or power or by the taking advantage of some weakness or disability or misfortune of the plaintiff.

*Id*, (emphasis added).

Defendants' deliberate indifference, required for all claims, satisfies this standard. The Ninth

Circuit has equated the objective deliberate indifference standard to "reckless disregard." *Gordon*, 888 F.3d at 1125 ("… the plaintiff must prove more than negligence but less than subjective intent—something akin to reckless disregard.").

Defendants' abuse of their authority over this pretrial detainee with serious medical needs also meets the standard of oppression, which the Ninth Circuit has further explained as a "misuse of authority or power or exploitation of a plaintiff's weakness." *Dang*, 422 F.3d at 809. Randall Johnson was powerless to provide for his own medical needs in jail. As Defendants knew, he was completely dependent on them for needed medical care. "When a jury is instructed that it may award punitive damages for oppressive acts, the jury must consider the relative positions of power and authority between the parties and determine whether the defendant misused his power or authority or abused the plaintiff's weakness in the course of the wrongful conduct." *Id*.

The Supreme Court long ago explained that where a prison fails to provide for inmates' basic human needs, "[i]n the worst cases, such a failure may actually produce physical 'torture or a lingering death,' … the evils of most immediate concern to the drafters of the [Eighth] Amendment." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). (citation omitted). That is exactly what Defendants caused here.

Moreover, the jury can find that Randall Johnson's suffering and death was set in motion by Defendants' corporate practices calculated to increase their profits, with disregard for the foreseeable suffering, death, and violations of rights those practices would cause. Defendants saved millions of dollars by staffing California jails with LVNs when RNs were required. This practice has continued even after the California Board of Vocational Nursing and Psychiatric Technicians (BVNPT), through their representative Ann Shuman, RN, informed the Wellpath Defendants that their use of LVNs to triage and assess inmates' medical needs is outside the legal scope of practice for LVNs. Ms. Shuman so informed these corporate defendants on February 14, 2017 -- a year and a half *before* Randall Johnson's death. Plaintiff will call Ms. Shuman as a witness at trial.

The Wellpath Defendants knew that their staffing scheme was both wrong and dangerous. As Defendant CFMG promised Shasta County it would *not* do when it responded to the County's Request for Proposals for the contract to provide inmate medical services at the jail in 2015, Defendant CFMG acknowledged:

- "It's easy for a provider to offer a lower price up-front by proposing to hire lower cost, less qualified staff, by cutting hours, by skimping on staff training, and even by not filling shifts when staff members are sick or absent. The problem is that the long-term consequences and higher long-term costs are often hidden, and can add up to far more than the apparent savings in the contract. Costs like … Increased risk of litigation."
- "… [W]e don't cut corners when it comes to staffing. … We never throw an untrained person into a new situation, which can lead to unhappy staff, poorly served inmates and a dangerous level of inconsistency."

(Plf's Trial Ex. 109, bates 2777, 2860).

As set forth above, the contract for jail medical services at the time of Randall Johnson's death, and even now, was between Shasta County and Defendant California Forensic Medical Group (CFMG). (Plf's Tr. Ex. 1). At the time of Randall Johnson's death, numerous witnesses will testify that CFMG had been acquired by Defendant Correctional Medical Group Companies, Inc. (CMGC), which fulfilled CFMG's contractual obligations through CMGC's medical staff defendants and its medical policies on CMGC letterhead. CMGC later merged with another jail healthcare company to create Wellpath – now a "family" of at least 65 companies including CFMG. In connection with that merger, CMGC changed its name to (Defendant) Wellpath Management, Inc. CMGC and Wellpath Management, Inc. are the same exact company.

The Wellpath Defendants' Person Most Knowledgeable on their financial position, Tabatha Vanns, works for Wellpath LLC but serves as Controller and Senior Vice President of Finance for the entire Wellpath family of companies, including CFMG. Ms. Vanns admits that currently, CFMG is a Variable Interest Entity (VIE) of one of the companies in the Wellpath "family." All of the Wellpath family entities' financial information, including CFMG's, is on a single consolidated tax return. Evidence will show that CFMG is controlled by Wellpath LLC, which siphons off CFMG's profits as "management fees" and possibly "loans." Plaintiff's expert forensic accountant, Annette Stalker, CPA/CFF, CFE, will explain that CFMG would be insolvent as a stand-alone company, but persists as a VIE due to Wellpath LLC's financial control including its absorption of CFMG's "losses" after taking millions in "management fees."

Ms. Stalker will explain, **"[A] variable interest entity, by definition, is not an independent organization. [CFMG's] financial condition and its financial viability is dependent on another organization or series of organizations."** (Stalker Dep., 33:21 – 34:5). Importantly, that means here:

**Based on the testimony of Vanns and the FASB requirements with regard to variable**

> **interest entities, CFMG is not and should not be considered as a stand alone entity. Rather, it should be consolidated into, in this case, the "Wellpath family" of 65 entities, all of which appear to be ultimately owned by a limited partnership for which no financial records have been provided.**

(Stalker Report, p. 11) ((doc. 224, p. 30).

Given CFMG's VIE status, Generally Accepted Accounting Principles (GAAP) require that any assessment of its current financial position must include the current financial position of the controlling entities, including Wellpath LLC.

"[E]vidence of a tortfeasor's wealth is traditionally admissible as a measure of the amount of punitive damages that should be awarded." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 270 (1981). The jury may consider Defendants' financial position in determining a punitive damages amount so that the verdict does not violate Defendants' due process rights. See *Pacific Mutual Life Insurance Company v. Haslip*, 499 U.S. 1, 21-22 (1991). It is "well-settled" that a defendant's "net worth" is a factor that is "typically considered in assessing punitive damages." *White v. Ford Motor Company*, 500 F.3d 963, 976-977 (9th Cir. 2007) (quoting *TXO Products Corporation v. Alliance Res. Corporation*, 509 U.S. 443, 462 n. 28 (1993)).

Contrary to Defendants' assumption in some of their motions in limine, it is the defendant's *current* financial position that matters; not its financial position at the time of the violation of rights. See *Pooshs v. Phillip Morris USA, Inc.*, 287 F.R.D. 543, 550 (N.D. Cal. 2012) ("the defendant's wealth is to be measured as of the time of the trial on punitive damages"); *Teller v. Dogge*, 2:12-cv-00591-JCM, 2013 U.S. Dist. LEXIS 52215 at *8; 2013 WL 1501445 (D. Nev. Apr. 10, 2013) ("Although only the defendant's current net worth is relevant to the issue of punitive damages, courts generally permit the plaintiff to conduct some retrospective discovery regarding the defendant's assets and income."); *Vieste, LLC v. Hill Redwood Dev.*, No. 09-cv-04024-JSW (DMR), 2011 U.S. Dist. LEXIS 29137 at * 10-11, 2011 WL 855831 (N.D. Cal. Mar. 9, 2011) (only discovery of defendant's *current* financial position relevant for punitive damages); *M.H. v. County of Alameda*, No. 11-cv-02868-JST, 2014 U.S. Dist. LEXIS 44852 at * 5-6 (N.D. Cal. Mar. 31, 2014) (same). Although Plaintiff only seeks punitive damages under federal law, the same is true under California law. *Provident Life & Accident Ins. Co. v. O'Connor*, 32 Fed. Appx. 821, 825 (9th Cir. 2002) ("California cases generally hold that evidence of net worth at the time of trial, not income or revenue, is the most appropriate measure of wealth for punitive damages

calculations.”).

For California state law claims, it is the plaintiff’s burden to introduce evidence of the defendant’s financial position. *Adams v. Murakami*, 54 Cal.3d 105, 123 (1991). However, the burden is reversed for the federal claims here, where it is the defendant’s burden of proof under federal law. Accordingly, in *Morgan v. Woessner*, 997 F.2d 1244, 1259, 1269 (9th Cir. 1993), after reviewing punitive damages awards on both federal and state law claims, the Court remanded the federal punitive damages for the district court “to analyze the award under the [*Haslip*] principles,” and remanded the state punitive damages, where evidence of the defendant’s financial condition was required under state law, for the district court “to hear evidence regarding [the defendant’s] financial condition.”

The Court in *Webb v. Ackerman*, No. CV-13-9112-PLA, 2017 U.S. Dist. LEXIS 217146 at *21-22 (C.D. Cal. Sept. 26, 2017), explained:

> “[U]nder federal law, a jury may consider the ability of a Defendant to pay the award to determine whether an award is reasonable.” *Rodriguez v. Cty. of Los Angeles*, 96 F. Supp.3d 990, 1009 (C.D. Cal. May 29, 2014). However, “[w]hile . . . the ability to pay is of some importance, there is nothing . . . which holds that the burden of proof is upon the injured party to produce evidence showing the misappropriator's ability to pay.” *Tri-Tron Int'l v. Velto*, 525 F.2d 432, 438 (9th Cir. 1975); see also *Davis v. Mason Cty.*, 927 F.2d 1473, 1485 (9th Cir. 1991) (refusing to consider challenge to punitive damages award [in § 1983 case] on the ground that jury did not consider evidence of net worth, noting that the deputies did not offer evidence of net worth to the jury, and did not object when the jury was not instructed on the issue).

See also *Rodriguez,* 96 F. Supp.3d at 1009 (affirming punitive damages award in § 1983 case, because “Defendants failed to prove that the punitive damage awards exceeded the Defendants’ abilities to pay despite providing evidence to the jury about Defendants’ net worth.”). These cases also indicate that a defendant may waive any challenge to a punitive damages award based on its ability to pay if it fails to offer appropriate evidence on that issue.

Plaintiffs also may introduce evidence of a defendant’s financial position so that the jury can choose an appropriate amount of punitive damages that will have the desired “sting.” See *Bains LLC v. ARCO Prods. Co.*, 405 F.3d 764, 777 (9th Cir. 2005) (“A punitive damages award is supposed to sting so as to deter a defendant’s reprehensible conduct, and juries have traditionally been permitted to consider a defendant’s assets in determining an award that will carry the right degree of sting.”); *White,* 500 F.3d at 977 (“Determining what amount of punitive damages will ‘sting’ the defendant requires consideration of

its *total* wealth, not merely wealth derived from wrongdoing.").

Punitive damages are designed to fulfill public purposes of punishment and deterrence. *Adams v. Murakami*, 54 Cal.3d at 110. Those public purposes are not fulfilled both in cases of over-punishment and under-punishment. *Delos v. Farmers Group, Inc.*, 93 Cal. App. 3d 642, 667 (1979) ("a punitive damage award which fails to adequately punish is as legally defective as an award which over-punishes").

**Importantly, courts recognize that where a subsidiary is liable for punitive damages, and financial information is on consolidated financial statements as is the case here, the wealth of the parent or related subsidiary is relevant for determining the amount of damages that should be assessed.** *TXO Production Corp. v. Alliance Resources Corp.*, 419 S.E.2d 870, 890 (W.Va. 1992), *aff'd*, 509 U.S. 443 (1993), *Mihara v. Dean Whitter & Co., Inc.*, 619 F.2d 814, 824 (9th Cir. 1980); *Riley v. Empire Airlines, Inc.*, 823 F.Supp. 1016, 1023 (N.D.N.Y. 1993) (if punitive damages appropriate, fact finder should consider wealth of defendant including any parent or subsidiary); *Dushaw v. Roadway Exp., Inc.*, 816 F.Supp. 1229, 1239 (N.D. Ohio 1992) (court takes judicial notice of parent's wealth in awarding punitive damages); *Schlang v. Key Airlines*, 794 F.Supp. 1493, 1513 (D. Nev. 1992) (court considered earnings and value of defendant's parent company is assessing punitive damages).

This is not "piercing the corporate veil." Plaintiff is not seeking to hold Defendants' private shareholders directly liable. Rather as these cases explain, it is the only way to assess the current financial position of certain companies such as those here, because Defendants are variable interest entities.

In a similar case involving consolidated financial statements, the Supreme Court affirmed a state supreme court permitting admission into evidence of the parent company's wealth for punitive damages purposes. In *TXO Production Corp. v. Alliance Resources Corp.*, 419 S.E.2d 870, 890 (W.Va. 1992), *aff'd*, 509 U.S. 443 (1993), the defendant TXO Production Corp. appealed a punitive damages award of $10,000,000 – 526 times greater than the compensatory damages of $19,000 – in part because the jury was allowed to consider what TXO claimed was irrelevant financial information of its parent company, USX. 419 S.E.2d at 890. The West Virginia Supreme Court explained,

> Because the [plaintiff]-appellees were unable to obtain information about the worth of TXO Production Corp. from TXO, the appellees provided their own expert to testify about the worth of the TXO Division of USX. Using public financial statements for USX, the expert testified that the net worth of the TXO Division of USX was between $ 2.2 billion and $ 2.5 billion. TXO argues that because the TXO division is "comprised of at least 15 corporate entities in addition to TXO Production Corp.," … the introduction of this

testimony was unfairly prejudicial.

*Id.* The West Virginia Supreme Court rejected TXO's argument, explaining that, "[t]he worth of the TXO Division of USX, and the worth of USX for that matter, is relevant." *Id.*

> If we did not allow trial judges in their sound discretion to admit evidence of the worth of parent corporations, corporations could escape liability simply by incorporating separate departments as a number of undercapitalized subsidiaries. It is the management of USX that must ultimately make the decision that its employees will not engage in malicious and nefarious business activities, and, therefore, it is the pocketbook of USX that the jury verdict must reach.

*Id*.

In affirming the award of punitive damages, which was based in part on evidence of the defendant's parent corporation's wealth, the United States Supreme Court noted that while TXO had objected to such evidence, TXO itself had not offered any evidence in rebuttal with respect to whether some of the net wealth evidence presented included the wealth of affiliated companies. 509 U.S. at 450 and n. 9. The Court recognized that the plaintiff had "introduced evidence that TXO was a large company in its own right and a wholly owned subsidiary of an even larger company." *Id*. The Supreme Court further explained, "TXO also contends that the admission of evidence of its alleged wrongdoing in other parts of the country, as well as the evidence of its impressive net worth, led the jury to base its award on impermissible passion and prejudice. … Under well-settled law, however, factors such as these are typically considered in assessing punitive damages." 509 U.S. at 462, n. 28.

Similarly, in *Mihara v. Dean Witter & Co.*, 619 F.2d 814, 824 (9th Cir. 1980), the defendant, Dean Witter & Company, objected to the admission of annual financial reports of itself and its parent corporation, Dean Witter Organization. The Ninth Circuit held "The annual reports (though they reflect the income of the parent corporation, Dean Witter Organization, rather than Dean Witter & Company) and Gracis' tax returns, were clearly relevant for the determination of punitive damages."

Accordingly, where a defendant was a variable interest entity ("VIE") of another defendant company, the "consolidated financials" of both companies were relevant for purposes of punitive damages. *Meeker v. Life Care Ctrs. Of Am., Inc.*, No. 14-cv-02101-WYD-NYW, 2015 U.S. Dist. LEXIS 162989 at *20-23 (D. Colo. Dec. 4, 2015).

Defendants' own financial expert, Frank Wisehart, admitted that CFMG is only able to stay in business because Wellpath LLC loans it money. (Wisehart Dep. p. 102:8-24). Mr. Wisehart also admitted

that, in determining the financial condition of CFMG, one looks to the income the company expects to receive in the future from its contracts, as well as its ability to borrow money from Credit Suisse and other Wellpath companies, like Wellpath LLC. (Wisehart Dep., 124:4-16, 148:15-149:4).

As set forth in Ms. Stalker's Rule 26 report, pp. 2-19 (doc. 224, pp. 21-38), Wellpath LLC financially manages and controls CFMG, including taking multi-million dollar "management fees" and paying CFMG's financial shortfalls. Wellpath LLC currently provides CFMG's human resources, hiring, benefits, employee supervision, staffing, accounts receivable and accounts payable management, contract negotiations, policies and procedures for use in jails 'served' by CFMG, accounting, tax reporting, insurance, and legal services. As a VIE, CFMG by definition is not an independent entity. GAAP accounting principles require that the current financial position of the controlling entity, Wellpath LLC, must be considered in order to assess the current financial position of the VIE, CFMG.

Dated: June 20, 2023

HADDAD & SHERWIN LLP

*<u>/s/ Michael J. Haddad</u>*
Michael J. Haddad
Attorneys for Plaintiff